## STRAWBERRY VALLEY CATTLE COMPANY, Respondent, *v.* JOHN I. CHIPMAN, Appellant.

TRESPASS—INJUNCTION — IRREPARABLE INJURY — INDIAN LANDS — SURRENDER—CONSIDERATION.

1. Where acts of trespass are repeated, continuing, and ruinous, or the damages irreparable, and a remedy at law would be inadequate, an injunction will lie.

2. In a lease of lands occupied and held by the Indians on the Uintah reservation according to the provisions of the law of congress passed February 28, 1891 (Supp. Rev. St. U. S. [2d Ed.] pp. 897, 898), the words "bought and paid for" were not intended by congress to be a limitation to lands which had been actually paid for in cash, or to lands which had been patented, and the title thereto actually parted with, by the United States. It was doubtless the intention of congress, that the statute and those words should apply to all lands which had been purchased by the Indians, either by the payment of money, or exchange, or by the surrender of the possession of other property.

3. The surrender of the rights of the Uintah Indians to other lands constituted a valuable and moving consideration for the lands which they acquired for their places of abode in the future, and which, by the terms of the lease, passed to the plaintiff, for a term of years, for grazing purposes.

No. 709. Decided June 3, 1896. 45 P. R. 348.)

Appeal from the district court of the First judicial district, Territory of Utah. Hon. W. H. King, *Judge.*

Action by the Strawberry Valley Cattle Company against John I. Chipman for damages sustained by plaintiff in consequence of the trespass of defendant's sheep upon the land leased by the plaintiff from the Indians on their reservation at Uintah. Damages were asked for and also an injunction to prevent further injury to the grazing lands. From a judgment sustaining the validity of plaintiff's lease and enjoining defendant from further trespass, the latter appeals. *Affirmed.*

*Williams, VanCott & Sutherland,* for appellant.

The contention of appellant is that the lands in question have *not been bought and paid for by the Indians who occupied them,* and therefore they do not come within the proviso of this act.

These words, "bought and paid for," have a clear and definite meaning, and unless something in the act indicates a different intention on the part of congress, this meaning should be adopted and followed by the court. Sutherland Stat. Con. 247, 237-8.

By the use of these words it is clearly implied that there are two classes of lands occupied by the Indians as reservations, one of which was bought and paid for, and one of which is not, and that only the former may be leased. If not, congress would have said that all lands

occupied as Indian reservations by Indians might be leased in the manner provided.

In a certain sense it may be said that all reservations occupied by Indians are owned by them; they have the unquestioned right of occupancy until such right has been extinguished by voluntary session to the government. *Cherokee Nation* v. *George*, 5 Pet. 1.

So long as they have not ceded their right to the general government, for all practical purposes they are the owners of the lands. They cannot be dispossessed except with their consent.

In the case of *Johnson* v. *Mackintosh*, 8 Wheat. 543, the court said, page 574: "They (the Indians) were admitted to be the rightful occupants of the soil, with a legal, as well as just, claim to retain possession of it and to use it according to their own discretion. But their rights to complete sovereignty as independent nations, were necessarily diminished, and their power to dispose of the soil at their own will to whomsoever they pleased, was denied by the original fundamental principle, that discovery gave exclusive title to those who made it." *United States* v. *Kagama*, 118 U. S. 375; *Godfrey* v. *Beardsley*, 2 McLean 412; *Marsh* v. *Brooks*, 8 How. 223; *Doe et al.* v. *Wilson*, 23 How. (U. S.) 457; *U. S.* v. *Shanks*, 15 Minn. 380; *Goodfellow* v. *Muckey et al.*, 1 McCreay 238; *Wheeler* v. *Meshinggomesia*, 30 Ind. 402; *M. K. & T. Ry. Co.* v. *Roberts*, 152 U. S. 114, 116; *Buttz* v. *N. P. Ry. Co.*, 119 U S. 56-55; *Beecher* v. *Wetherby*, 95 U. S. 517, 522, 525.

In the trial of the case below some doubt was suggested whether Indian tribes could purchase lands from the government, in the usual sense of that word. That they may, will not admit of dispute.

It has been expressly so held in the following cases: *Holden* v. *Joy*, 17 Wall. 211, 238, 241, 245; *U. S.* v. *Rogers*, 2 Fed. Rep. 658, 664; *U. S.* v. *Reese*, 6 Dill. 405.

The use of the words "bought and paid for" in the act of February 28, 1891, imports not only that the lands are owned by the Indians; not only that the government has transferred its ultimate title to them, but that this has been done by a transaction involving a sale on the part of the government and purchase and actual payment on the part of the Indians. At the very least, before the lands can be considered as bought and paid for within the meaning of the statute, the Indians must own them in fee. This is not the case with the Uintah reservation, because the right the Indians have in the reservation is precisely the right which they had before the law creating the reservation was passed, viz.: That of exclusive and permanent occupation. No provision has been made for any tribe or tribes of Indians, having the right to reside upon the reservation, to hold title. No specific tract or tracts of land are pointed out or described. No grantee is pointed out. Congress by placing the Colorado Indians upon the reservation has recognized that the Utah Indians are not the owners in fee. The history surrounding the passage of the act shows that congress had in mind lands which have been conveyed to certain Indian tribes, such as the Cherokees and others, and for which they had actually paid money or other property.

There is no injury proven in the case, such as would justify the issuance of an injunction. The only injury shown was the destruction of the grass and verdure growing upon the lands. There was testimony tending to show that this would render the land worthless for grazing purposes for the remainder of the term of the plaintiff's lease. This is not an irreparable injury. It can be amply atoned for in money. No suggestion is made that the defendants are insolvent, so that the presumption is that they are amply able to respond in damages. 1 High Inj., sec. 699, 706; *Smith* v. *Gardiner*, 53

Am. Rep. 342, 2 Ind. 536; *Jerome* v. *Ross*, 7 Johns. Ch. 330, s. c. 11 Am. Dec. 484 and note.

Some suggestion was made that an equitable suit might be maintained in order to prevent a multiplicity of suits. This doctrine does not apply in this case. In order to warrant the equitable proceeding on this ground there must be different persons assailing the same right. Repeated or continuing trespasses by the same person are not sufficient. 1 High Inj., sec. 700; 53 Am. Rep. 347.

*Richards & Richards*, for respondent.

The meaning of the words "bought and paid for" should be construed with reference to the intention of congress, as shown by the entire statute. *Atkins* v. *Fiber Co.*, 18 Wallace 301-302, and cases cited; *Church* v. *United States*, 143 U. S. 459.

If the lands covered by the lease are the only kind upon which the statute can operate, or the only kind of lands upon which it was intended that it should operate, the well established rule applies that the statute must be given such a construction as will make it effective if it is possible to do so. Sutherland on Stat. Con., secs. 218-219-241-243-245-246; Endlich on Stat. Con., secs. 265-301.

Every presumption is in favor of the validity of the lease. *Mentor* v. *Cromolen*, 18 Howard 88; *Smelting Co.* v. *Kemp*, 104 U. S. 636-647.

The title obtained by the Indians to specific tracts is acquired by treaty, either by exchange or surrender of other lands, and whatever evolutions may be gone through in the transactions, it all reverts to the proposition that the Indians, having originally the unquestioned right of occupancy to all the land, obtain the exclusive right in smaller parcels of the same or other lands, by the relinquishment to the government of their right

to other portions of their lands, and as is the case of the Utes they trust in the "justice and liberality" of the government to "promote their happiness and prosperity" by the appropriation of funds to aid them in industrial pursuits. *Holden* v. *Joy*, 17 Wall. 243; *Johnson and Graham's Lessee* v. *McIntosh*, 8 Wheat. 543, and many other cases.

The title to all tribal lands is exactly the same, and is acquired in the same manner, whether evidenced by patent or treaty. In neither case have they the right to lease or sell them, without the approval of the government, and the Indians always remain the wards of the government, even in the case of lands allotted in severalty. *Smith* v. *Stevens*, 10 Wall. 321; *Holden* v. *Joy*, 17 Wall. 243.

As an authority for granting an injunction respondent recited: 1 High on Injunction, sec. 697; *Staines* v. *Hall*, 3 L. R. A. 609 and note, p. 612-613; *Lembeck* v. *Nye*, 8 L. R. A. 578; *Boyce* v. *Grundy*, 3 Pet. 210; *Watson* v. *Sutherland*, 5 Wall. 74-80; *Hicks* v. *Compton*, 18 Cal. 591; *United States* v. *Loving*, 34 Fed. Rep. 715; *Ellis* v. *Wren*, 84 Ky. 254; *Milan Steam Mills* v. *Hickey*, 59 N. H. 241.

BARTCH, J.:

This action was brought to enjoin the defendant from permitting his sheep to graze on certain lands situate in the southeastern part of this State, and forming a part of the Uintah Indian reservation. The plaintiff claims the right to the possession of said lands under and by virtue of a certain lease executed by one Robert Waugh, the Indian agent of the reservation, acting under instructions of the secretary of the interior, for and on behalf of the Uintah and White River Ute tribes of Indians, with the consent and authority of those tribes granted in council representing and speaking for them, and by one Charles F. Homer, lessee, under the provisions of the act

of congress of February 28, 1891. To this lease is attached an instrument executed by 18 chiefs and headmen representing the said tribes, wherein it appears that their unqualified consent has been given to the transaction. By the terms of the lease the lessee acquired the right to the possession of, approximately, 645,000 acres of land, for the purpose of grazing cattle thereon, for a period of five years, and for this privilege is to pay to the Indian agent, for the benefit of said Indians, $7,100 per annum, and under pain of forfeiture, is prohibited from permitting sheep to graze thereon. The lease was properly assigned to the plaintiff prior to the commission of the acts charged in the complaint. Among other things, the testimony tends to show that the defendant's sheep destroyed the grass and verdure, and rendered a portion of the land leased worthless for the remainder of the term of the lease, and that they continued to trespass until the service of the restraining order issued in this suit. The court found, in substance, that the plaintiff was entitled to the possession of the land by virtue of the lease; that the lease was made under the act of congress of February 28, 1891, with the consent and authority of said tribes granted in council representing and speaking for them; that it was approved by the secretary of the interior; that the lands leased were not needed for farming or agricultural purposes, nor desired for individual allotments; that the lands in question "had been bought and paid for by said Indians"; and that the plaintiff was suffering, and unless the defendant was restrained, would continue to suffer, irreparable loss and injury. Judgment having been rendered for the plaintiff, and a motion for a new trial overruled, the defendant appealed to this court.

The principal point relied on by the appellant for a reversal of the case is that the alleged lease is void on the

ground that there was no authority of law for making it. The respondent maintains that such authority is contained in the act of congress of February 28, 1891 found in the second edition of the supplement to the Revised Statutes of the United States, on pages 897 and 898. This act amended section 1 of the act of February 8, 1887 (24 Stat. 388), which provided, among other things, for the allotment of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the territories over the Indians. It further extended to them the benefits conferred by that act, and section 3, after providing that in case any allottee, because of age or other disability, cannot occupy or improve his allotment, the same may be leased for a certain period upon such terms and conditions as may be prescribed by the secretary of the interior, contains a proviso as follows: "When lands are occupied by Indians who have bought and paid for the same, and which lands are not needed for farming or agricultural purposes, and are not desired for individual allotments, the same may be leased by authority of the council speaking for such Indians, for a period not to exceed five years for grazing, or ten years for mining purposes in such quantities and upon such terms and conditions as the agent in charge of such reservation may recommend, subject to the approval of the secretary of the interior." The lease was made under this provision of the act, and it is contended by the appellant that the lands in question have not been "bought and paid for" by the Indians who have occupied them, and do not come within the proviso, and that, therefore, the lease is void, because prohibited by section 2116 of the Revised Statutes of the United States, which, as far as material here, read as follows: "No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or

tribe of Indians, shall be of any validity in law or equity, unless the same is made by treaty or convention entered into pursuant to the constitution." Under this section no lease for lands occupied by any tribe of Indians was valid unless the same was made by treaty or convention entered into pursuant to the constitution. It is clear that the lease in controversy comes within the inhibition of this section, and under it would be invalid, but the respondent relies upon the provisions of the act of February 28, 1891, which is a later law, as authority for making it; and if such authority exists by virtue of that act, then the lease must be upheld, notwithstanding the inhibition contained in section 2116, because, under a familiar rule of construction of statutes, when the provisions of a former law are repugnant to those of a later they are repealed, to the extent of such repugnancy, and this even though there are no words of repeal in the later law. In such case the repeal is affected by implication. Under the act of February 28, 1891, it will be observed that the lands occupied by Indians who have "bought and paid for the same" may be leased under the authority of the secretary of the interior. The controlling point in this case, therefore, is whether the Indians who occupied the lands in question at the time of the execution of the lease had bought and paid for them.

The appellant contends that the use of the words "bought and paid for" imports, not only that the lands are owned by the Indians, and that the government has transferred its ultimate title to them, but that this has been done by a transaction involving a sale on the part of the government, and actual payment on the part of the Indians. The respondent maintains that the words "bought and paid for" mean what they usually import in their ordinary acceptation, and were used in the act to denote the acquisition of ownership, or right to exclu-

sive possession, either by purchase, exchange or surrender. In considering this question, it will be necessary, not only to ascertain the meaning of those words as used in the act, but also to determine what constitutes a sale of lands to Indians. Webster defines the word "buy," of which "bought" is a participle: "To acquire the ownership of by giving an accepted price or consideration therefor, or by agreeing to do so to acquire or procure by something given or done in exchange,"— and the word "pay": "To satisfy or content; specifically, to satisfy for service rendered, property delivered, etc." The word "ownership" he defines: "The state of being an owner; the right to own; exclusive right of possession." These definitions show the ordinary and accepted meaning of the words in question, and there appears to be nothing in the act of February 28, 1891, limiting such meaning, or to show that any other meaning or use was intended by congress. In construing a statute, common words must be held to have been used in their popular sense, unless something to the contrary appears in the context, or unless this would defeat the intention of the legislators. The appellant insists that the plain meaning of the phrase in question is that an affirmative act shall have taken place, by which the United States, on the one hand, has parted with its title, and the Indians, on the other hand, have acquired it, and that there has been a price fixed, and actually paid by the Indians to the government. An examination of the whole act fails to reveal any intention of congress to so limit the meaning of the words. Doubtless it was intended to confer benefits and powers upon the Indians, respecting their lands, which they did not possess under the laws as they then existed; and it was not necessary that the United States should part absolutely with the title, or that a price should be fixed and actually paid, if by this is meant payment in cash, before

lands acquired by Indians could be characterized as lands "bought and paid for." An examination of the history of this country, relating to the Indians, will show that it has never been the policy of the United States, in dealing with Indian tribes in regard to their lands, to part with the ultimate title. It has never recognized such title in the tribes. It is true, the Indians were the original occupants of the soil, over which they hunted and roamed, and occasionally built villages, and, before the discovery of America, were the exclusive possessors thereof; but by right of discovery the United States, being the successor to Great Britain, has, ever since the revolution, asserted an ultimate fee in the land. In this it has followed the policy of the governments of Europe, before the revolution, and the states, towards the aborigines, in the discovery of America, and has never recognized any authority in Indian tribes to sell or transfer their lands to any other nation. Nor has it ever recognized any right in other nations, or in private persons, to purchase said lands, by treaty or otherwise. While they maintain their tribal relations, they hold, in some respects, an independent position; but they are not regarded as a foreign state or nation, nor as having the full attributes of sovereignty. They have been considered so far a separate people, however, that they have a right to manage their tribal affairs and social relations without, in these regards, being subject to the laws of the state in which they reside, or of the United States. Upon the approach to the western continent of civilized people, discovery gave title to the government by whose subjects it was made, and upon the formation of the American Union the United States, within its limits, succeeded to all the rights acquired to the soil by discovery; but this did not affect the rights of the Indians, as occupants by virtue of a more ancient discovery, or as aboriginal occupants.

This government, however, acquired the exclusive right to purchase from the Indians, and conceded to them the right to sell their possessions to it, but not to any foreign power; maintaining that the ultimate title to all tribal lands is in the United States, subject to the unquestioned right of occupancy in the aborigines. *Cherokee Nation* v. *State of Georgia,* 5 Pet. 1; *Holden* v. *Joy,* 17 Wall. 211; *U. S.* v. *Kagama,* 118 U. S. 375, 6 Sup. Ct. 1109; *Railway Co.* v. *Roberts,* 152 U. S. 114, 14 Sup. Ct. 496. Reflections upon the history and policy of the government in its dealings with the Indians go far to support the position that congress did not intend to limit the words "bought and paid for" to lands which had been actually paid for in cash, or to lands which had been patented, and the title thereto actually parted with, by the United States. It was doubtless the intention of congress that the statute and those words should apply to all lands which had been purchased by the Indians, either by the payment of money, or exchange or surrender of the possession of other property. This conclusion seems to be in consonance with the spirit which has always characterized this government respecting tribal lands. Counsel for the appellant are probably correct when they say that there are two classes of lands occupied by Indians, in one of which they are "bought and paid for," and in the other they are not. The one class consists of specific tracts acquired by purchase, exchange or surrender by treaty. The other comprises reservations created by executive order or legislative enactment. In all of these lands, while the tribal relations exist, the United States retains the ultimate fee, and the Indians the right of occupancy.

The views thus entertained are supported by the construction which the government itself has placed upon the statute under consideration, as is evidenced by a

13 UTAH—30

letter, dated January 11, 1892, of the assistant attorney general of the department of the interior, and concurred in by that department, wherein it is said: "It is very clear that congress intended by this act to confer upon the Indians and upon the department powers which they did not therefore possess, and the provisions of this section are clear and unambiguous. The parties who may lease lands are Indians who have 'bought and paid for' the same. Congress was legislating with reference to those Indians who have, under treaty or otherwise, become possessors or owners of certain specific tracts or bodies of lands, by purchase, or exchange or surrender of other property, in contradistinction to those Indians who are occupying reservations created by executive order or legislative enactment. The words 'bought and paid for' do not, in my opinion, imply that the consideration for the lands must have been cash in hand paid by the Indians, but rather that the words were used in their ordinary and usual acceptation, and signify a purchase, either by the payment of money, or by exchange or surrender of other property or possessions." It also appears from a letter of D. M. Browning, commissioner of Indian affairs, to the secretary of the interior, dated January 30, 1895, wherein the above-mentioned letter is referred to, that the government has held this statute to apply to lands under similar title to that of the Uintah reservation.

While this contemporaneous construction cannot materially affect the decision of this case, still it is entitled to some consideration, as showing the practical construction which the government has placed upon the statute by its officers. The Utah Indians roamed and hunted over the lands in Utah. They had title by right of possesion as original occupants. This was recognized by the United States when it, by treaty, induced them to

surrender, for certain considerations, the possession of the largest portion of their lands, to cease their roaming and rambling habits, and to confine themselves within certain limits, to be thereafter defined. This treaty was made December 30, 1849 (9 U. S. Stat. 985). The boundaries of the lands which the Indians acquired by the treaty were fixed by statute passed May 5, 1864, section 2 of which provides as follows: "That the superintendent of Indian affairs for the territory of Utah be, and he is hereby, authorized and required to collect and settle all or so many of the Indians of said territory as may be found practicable in the Uintah valley, in said territory, which is hereby set apart for the permanent settlement and exclusive occupation of such of the different tribes of Indians of said territory, as may be induced to inhabit the same." 13 Stat. 63. This act sets apart the lands in question in this case. And congress again recognized the title to occupancy in the Indians, of the lands in Utah, in the act approved February 23, 1865, section 1 of which, after authorizing the president of the United States, by and with the advice and consent of the senate, to make treaties with the Indians of Utah territory, provides that "such treaties shall provide for the absolute surrender to the United States, by said Indians, or their possessory right to all the agricultural and mineral lands in said territory, except such agricultural lands, as by said treaties may be set apart for reservations for said Indians." 13 Stat. 432. This statute not only recognized their right of possession, but also required an absolute surrender thereof, to all their lands not within the reservation, in order that the Indians might obtain the benefits accruing to them by removing to the reservation. See, also, Act approved May 24, 1888 (25 Stat. 157). The government has made the same recognition of title in the Indians to the lands within the Uintah reservation, in the

recent attempt to open up a portion of the lands for set-
tlement by the act approved August 15, 1894, which pro-
vides for the appointment of a commissioner to allot
lands in severalty, and for the manner of allotment, and
that the commissioner "shall negotiate and treat with
the Indians properly residing upon the Uintah Indian
reservation in the territory of Utah, for the relinquish-
ment to the United States of the interest of said Indians
in all lands within said reservation not needed for allot-
ment in severalty to said Indians, and if possible, procure
the consent of such Indians to such relinquishment, and
for the acceptance by said Indians of allotments in sev-
eralty of lands within said reservation." It will be seen
from these several statutes that the government has
repeatedly and unmistakably recognized their natural
rights to the soil by immemorial and undisputed posses-
sion, subject only to the conditions imposed by the right
of discovery. The interests which the Utah Indians
were asked to agree to relinquish were valuable rights in
property, and how can it be said that the lands which
they acquired by surrendering their natural and possess-
ory rights to other lands were not "bought and paid for?"
The surrender of these rights by the Indians constituted
a valuable and the moving consideration for the lands
which they acquired for their places of abode in the
future. When the White River Utes removed to the Uin-
tah reservation, they surrendered to the government their
possessions in the state of Colorado, as shown by the act
of June 15, 1880 (21 Stat. 199). It would seem clear that
the surrender of these valuable possessions was a suffi-
cient consideration to characterize the lands which they
acquired by the exchange as "bought and paid for," under
the act of February 28, 1891, and the fact that the Uintah
reservation had already been purchased and accepted by
the Utah Indians could not change the character of the

transaction. If the Utah Indians were content to receive their Colorado brethren, and share with them, the United States had no cause to complain. Nor can such fact add strength to the appellant's case.

Counsel for the appellant refer to the Cherokee Nation as an example where Indian lands had been "bought and paid for." History, however, shows much similarity in the manner in which the Cherokee Nation and the Uintah and White River Utes acquired their lands, and especially is this so of the White River Utes. The Cherokee Indians originally claimed lands east of the Mississippi river. They were owners and occupants of those lands from time immemorial—before the approach of civilized man. As civilization made its encroachments, dissentions frequently arose between certain citizens and the Cherokee Nation. To prevent further difficulties, and adjust those which had arisen because of the residence of the Indians within settled portions of the United States, various treaties were made, with a view to the removal of the Indians, but without effect. One was concluded May 6, 1828; another February 14, 1833; and in both this government agreed to possess the Cherokee Nation of 7,000,-000 acres of land west of the Mississippi river, and to guaranty it to them forever, on certain conditions agreed upon. 7 Stat. 311; Id. 414. It is apparent from those treaties that the policy of the United States was to induce the Cherokees residing in any of the states or territories to surrender their possessions east of the Mississippi river, and in the then territory of Arkansas, to the United States, and remove to and settle on the lands west of Arkansas provided for them in those treaties. The purpose of the government was consummated by a new treaty, dated December 29, 1835 (7 Stat. 478), in the first article of which the Cherokee Nation ceded, relinquished, and conveyed to the United States all the lands owned,

claimed, or possessed by them east of the Mississippi river, and released "all their claims upon the United States for spoliations of every kind, for and in consideration of the sum of five millions of dollars to be expended, paid, and invested" by the government in the manner stipulated and agreed upon in other articles of the treaty. Thus it will be seen that in consideration of surrendering to the United States their possessory rights east of the Mississippi river, and those in Arkansas, they acquired 7,000,000 acres of land west of that river; and an examination of the various treaties will show a striking similarity between the transactions in the case of the Cherokees and those of the Uintah anl White River Utes. If the lands of the former are of the class which were "bought and paid for," it is difficult to see why the lands of the latter should not belong to the same class. The fact that the Cherokee Indians afterwards became apprehensive that they would not have sufficient land, and purchased more for a money consideration, did not affect or change the character of the lands theretofore acquired by surrender of their possessions. We conclude that the lands in question in this case are comprehended within the terms of the act of February 8, 1891, and hold that the lease in question was sufficiently executed, and is valid. We likewise hold that the injunction was properly issued.

The evidence tended to show that the trespass complained of was continued and continuing until the service upon the defendant of the restraining order, and that grass and verdure were destroyed, and a portion of the leased land rendered worthless for the remainder of the term of the lease. Where acts of trespass are repeated, continuing, and ruinous, or the damage irreparable, and a remedy at law would be inadequate, an injunction will lie. Spell. Extr. Rem. § 337; High, Inj. § 697; *Lembeck* v.

*Nye* (Ohio Sup.) 24 N. E. 686; *Erhardt* v. *Boaro*, 113 U. S. 537, 5 Sup. Ct. 565; *Haines* v. *Hall* (Or.), 20 Pac. 831; *Hicks* v. *Compton*, 18 Cal. 206; *Boyce's Ex'rs.* v. *Grundy*, 3 Pet. 210.

We are of the opinion that the respondent is entitled to the possession of the land in question, by virtue of its lease, and that there is no reversible erorr in the record. The judgement is affirmed.

MINER, J., and STREET, District Judge, concur.