## BRITISH-AMERICAN OIL PRODUCING CO. *v.* BOARD OF EQUALIZATION OF MONTANA ET AL.

No. 37. Argued November 11, 1936.—Decided December 7, 1936.

*Mr. H. C. Hall,* with whom *Messrs. E. K. Cheadle, Jr.,* and *E. J. McCabe* were on the brief, for petitioner.

*Mr. Oscar A. Provost* argued the cause, and *Mr. Raymond T. Nagle,* Attorney General of Montana, filed a brief, for respondents.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

A judgment of the Supreme Court of Montana sustaining state taxes on the production of oil and gas under a lease covering such minerals in certain lands of the Blackfeet Indians (101 Mont. 293; 54 P. (2d) 129) is here under review.

These Indians are wards of the United States and have been occupying a reservation in Montana. During recent years they have received allotments in severalty from lands in the reservation, and they now hold the allotments under so-called trust patents, whereby the United States declares that it will retain the title for a period of twenty-

five years in trust for the use and benefit of the several allottees, and at the expiration of that period will convey the same by patent to them or their heirs. Under the terms of the controlling statute, as also under the terms of the patents, all minerals, including coal, oil and gas, in or under the allotted lands are reserved to the United States for the benefit of the tribe "until Congress shall otherwise direct."

The petitioner holds a mining lease covering "all the oil and gas deposits in or under" certain of these allotted lands, a stated share of the gross production being reserved to the United States for the benefit of the Indian tribe as the lessor's royalty. The lease was authorized by a resolution of the tribal council, was recommended by the United States agent in charge of the reservation, was given for a term of five years from the date of its approval, was approved by the Secretary of the Interior October 5, 1934, and recites that it was given in accordance with § 3 of the Act of February 28, 1891, c. 383, 26 Stat. 795, as amended by Act of May 29, 1924, c. 210, 43 Stat. 244.

The taxes in question are a gross production tax and a net proceeds tax, and it is conceded that the State is without power to apply either to the production under this lease, save and except as Congress may have given its assent. Whether Congress has given its assent is the ultimate question, and this turns on the subordinate questions (a) which of several statutes controls the leasing of tribal lands in this reservation for mining oil and gas, and (b) whether the reserved oil and gas deposits underlying allotted lands in this reservation constitute unallotted lands in the sense of these statutes.

There have been two related but distinct lines of legislation respecting the leasing of tribal Indian lands for mining purposes. The older and more general line has been regarded uniformly as including lands in reserva-

tions created by legislation, such as a treaty or congressional enactment; and has also been regarded at times as including, and at other times as excluding, lands in a reservation created by executive order. The proviso to § 3 of the Act of February 28, 1891, and the Act of May 29, 1924, both before mentioned, belong to the first line. The later and narrower line, which doubtless was prompted by diverse administrative interpretations of the other, is in terms confined to lands in reservations created by executive order. The Act of March 3, 1927, c. 299, 44 Stat. 1347, belongs to this line.

We are of opinion, as was the state court, that the Blackfeet reservation, as existing in recent years, was created by legislation and not by executive order.

The original territory of the Blackfeet and other Indians associated with them included a large area, as is shown by a treaty of September 17, 1851, 2 Kappler Indian Affairs, 2d ed., 594, and a treaty of October 17, 1855, 11 Stat. 657. Under executive orders of 1873 and 1874, an Act of Congress of April 15, 1874, c. 96, 18 Stat. 28, and executive orders of 1875 and 1880, the Blackfeet and certain of the other Indians associated with them came to occupy a large part of this original territory as a reservation specially set apart for them.

By an agreement or convention, ratified by Congress May 1, 1888, c. 213, 25 Stat. 113, which recited various considerations moving from the Blackfeet to the United States and the reverse, and from the Blackfeet to their associates and the reverse, much of the earlier reservation was ceded to the United States, and three separate reservations, all within the limits of the earlier reservation, were created, one of these being set apart for the Blackfeet and the other two for the other Indians. By another agreement or convention, ratified by Congress June 10, 1896, c. 398, 29 Stat. 321, 353, which disclosed various considerations moving from the Indians to the Government and the reverse, part of the separate Blackfeet

reservation was ceded to the United States, and the remainder was set apart as the tribe's future reservation. This last reservation is the one with which we now are concerned. It rests entirely on the agreements or conventions which were ratified and given effect by Congress. The executive orders before mentioned, evidently designed to be temporary, have been superseded by congressional action and no longer are of any force.

We turn, therefore, to the legislation bearing on the leasing for mining purposes of tribal lands in such a reservation. We say "tribal lands" because (1) here the mineral deposits did not pass to the allottees but were reserved for the benefit of the tribe, and (2) other and distinct legislation controls the leasing for mining purposes of lands of individual allottees where there is no reservation of the mineral deposits.

The proviso to § 3 of the Act of February 28, 1891, reads:

"Where lands are occupied by Indians who have bought and paid for the same, and which lands are not needed for farming or agricultural purposes, and are not desired for individual allotments, the same may be leased by authority of the Council speaking for such Indians, for a period not to exceed . . . ten years for mining purposes in such quantities and upon such terms and conditions as the agent in charge of such reservation may recommend, subject to the approval of the Secretary of the Interior."

The Act of May 29, 1924, provides that "unallotted land on Indian reservations," other than lands of the Five Civilized Tribes and of the Osage Reservation, which are subject to lease for mining purposes under the above quoted proviso,

"may be leased at public auction by the Secretary of the Interior, with the consent of the Council speaking for such Indians, for oil and gas mining purposes for a period of not to exceed ten years, and as much longer.

thereafter as oil or gas shall be found in paying quantities . . . : *Provided,* That the production of oil and gas and other minerals on such lands may be taxed by the State in which said lands are located in all respects the same as production on unrestricted lands, and the Secretary of the Interior is hereby authorized and directed to cause to be paid the tax so assessed against the royalty interests on said lands; *Provided, however,* that such tax shall not become a lien or charge of any kind or character against the land or the property of the Indian owner."

The present lease recites that it was given under these general provisions, and the state court regarded them as both applicable and controlling.

The petitioner does not question that the reservation, as existing and occupied by the tribe in recent years, comes within the terms of the proviso in the Act of 1891 as lands which the Indians "have bought and paid for." Doubtless this is because the petitioner recognizes that by uniform administrative practice and by judicial decision this part of the proviso has been construed as not confined to lands acquired by Indians through the payment of a consideration in money, but equally including lands reserved for Indians in return for a cession or surrender by them of other lands, possessions or rights.[1] Further comment in this regard is not necessary.

Obviously the mineral deposits which are the subject of the lease are not needed for farming or agricultural purposes and are not desired for individual allotments.

The issue of the trust patents containing, as the statute requires, a reservation for the benefit of the tribe of all minerals, including oil and gas, in or under the allotted land, operates to carve out of such land and create a distinct estate consisting of the minerals. This estate is in

---

[1] 25 Land Dec. 408; *Strawberry Valley Cattle Co.* v. *Chipman,* 13 Utah 454, 462, *et seq.;* 45 Pac. 348.

itself land, and, being reserved for the benefit of the tribe, it is tribal land, and is unallotted.

What has been said, unless deflected by matters which remain to be noticed, shows, we think, that the reserved mineral estate which is the subject of the lease comes in all particulars within the terms of the general provisions before quoted, and that the lease should be regarded as authorized by that legislation and given under it.

But it is urged that there are other provisions specifically dealing with the leasing of the Blackfeet lands for mining purposes and that these provisions fully cover that field and therefore render the general legislation inapplicable. There are provisions expressly relating to such leasing of these lands, and therefore it becomes necessary to consider their scope and effect.

The Act of June 30, 1919, c. 4, 41 Stat. 3, 16, 17, contains the following:

" . . . the Secretary of the Interior is authorized to make allotments under existing laws within the said Reservation to any Indians of said Blackfeet Tribe not heretofore allotted . . .

"*Provided further,* That any and all minerals, including coal, oil, and gas, are hereby reserved for the benefit of the Blackfeet Tribe of Indians until Congress shall otherwise direct, and patents hereafter issued shall contain a reservation accordingly: *Provided,* That the lands containing said minerals may be leased under such rules and regulations and upon such terms and conditions as the Secretary of the Interior may prescribe."

The Act of September 20, 1922, c. 347, 42 Stat. 857, also provides:

"That lands reserved for school and agency purposes and all other unallotted lands on the Fort Peck and Blackfeet Reservations, in the State of Montana, reserved from allotment or other disposition, may be leased for mining purposes under regulations prescribed by the Secretary of the Interior."

It is to be observed that the administration of these special provisions and of the general provisions is committed to the supervision of the same officer—the Secretary of the Interior—and that in the exercise of this supervision he approved the present lease containing a recital that it was given in accordance with the general provisions. Not only so, but the agent in charge of the reservation recommended the lease, and the lessee accepted it, with that recital of its statutory foundation. In other words, all proceeded with the view that the general provisions are applicable, and not excluded by the special provisions.

We are of opinion that this view is right. The special provisions relate to the same subject that is dealt with in the general provisions and are to be read in the light of the latter. All were in force when the lease was given and all should be treated as one law so far as this reasonably can be done.[2] The general provisions are more comprehensive than the special. The latter are meager and wanting in detail. The general provisions supply what is thus wanting. And, so far as is here material, there is no conflict, nor anything to prevent all from being carried into effect as if they were one law.

We conclude that the lease was given under the special provision in the Act of June 30, 1919, taken in connection with the general provisions. The Act of May 29, 1924, is one of the general provisions, and in it Congress assents to taxation by the State of the production of oil and gas through a lease given under its provisions.

*Judgment affirmed.*

MR. JUSTICE STONE took no part in the consideration or decision of this case.

---

[2] *United States* v. *Freeman,* 3 How. 556, 564; *Converse* v. *United States,* 21 How. 463, 467. And see *United States* v. *Jefferson Electric Co.,* 291 U. S. 386, 396, and cases cited.