TEXACO, INC., Exxon Corporation, and Union Oil Company of California, Plaintiffs and Appellants,

v.

SAN JUAN COUNTY, et al., Defendants and Appellees,

and

Board of Education of San Juan County School District, et al., Defendants in Intervention.

No. 900298.

Supreme Court of Utah.

Feb. 17, 1994.

Bruce D. Black, Santa Fe, NM, for Texaco, Inc.

Kevin N. Anderson, Diane H. Banks, Douglas R. Brewer, Salt Lake City, for Exxon Corp.

John K. Mangum, Salt Lake City, for Union Oil of California.

R. Paul Van Dam, Atty. Gen., Michael M. Quealy, Asst. Atty. Gen., Salt Lake City, and L. Robert Anderson, Daniel G. Anderson, Monticello, and Craig C. Halls, Blanding, and Bruce R. Stewart, Stephen M. Truitt, A. Raymond Randolph, Washington, DC, for defendants.

Lyle R. Anderson, Monticello, for Board of Educ. of San Juan County.

ZIMMERMAN, Chief Justice:

Plaintiffs Texaco, Inc., Exxon Corporation, and Union Oil Company of California appeal a district court order denying their motion

for summary judgment and granting that of San Juan County. The district court upheld the imposition of certain state and local taxes on plaintiffs' oil and gas production within a portion of the Navajo Indian Reservation known as the Aneth Extension. We affirm.

The material facts are not in dispute. In 1933, Congress added certain lands in Utah known as the Aneth Extension to the already established Navajo Indian Reservation. *See* Act of March 1, 1933, ch. 160, 47 Stat. 1418 ("1933 Act"). The 1933 Act provided that 37½% of the net royalties from any oil or gas leases on the Aneth Extension would be paid to the state of Utah to be used for the benefit of the Indians residing in the Aneth Extension.[1] The Act is silent as to whether the revenues derived from the leases by the non-Indian lessees are taxable by state and local governments.

From 1953 through 1974, the Navajo Nation issued leases in the Aneth Extension to plaintiffs under the provisions of the Indian Mineral Leasing Act of 1938, ch. 198, 52 Stat. 347 (codified at 25 U.S.C. § 396a) ("1938 Act"). Plaintiffs paid all taxes levied by the State on this production without protest. In 1978, however, the Navajo Nation imposed tribal taxes on leases within the state of Utah, including those held on lands in the Aneth Extension. In response, plaintiffs, as well as other large oil companies holding leases on the reservation, paid their state taxes under protest. In 1979, these leaseholders filed complaints in the Seventh District Court challenging the legality of the State's taxing the production of non-Indian lessees on Indian lands. Specifically, they asserted that Congress had not expressly authorized the imposition of such state taxes in the 1933 Act, as required by 1933–era federal constitutional doctrine. Furthermore, they contended that Congress had pro-

vided for royalties to be paid to the state in lieu of taxation.

While this litigation was pending, the United States Supreme Court decided *Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989), which upheld New Mexico's tax on the revenues of non-Indian lessees derived from oil leases issued under the 1938 Act on an Indian reservation. In light of that decision, some of the original parties voluntarily dismissed with prejudice certain claims relating to taxes on lands outside the Aneth Extension. However, Texaco, Exxon, and Union Oil all remained in the case, contending that their claims regarding leases on the Aneth Extension were unaffected by *Cotton Petroleum.* These plaintiffs moved for summary judgment. Defendants also sought summary judgment, and on March 22, 1990, the district court issued a memorandum decision disposing of the motions. Relying heavily on *Cotton Petroleum,* the district court found that the 1933 Act did not preclude the State's taxation of revenues from leases on the Aneth Extension and granted summary judgment to defendants. Plaintiffs now appeal.

■ We first address the standard of review. When no facts are in dispute, a challenge to a summary judgment presents only conclusions of law. Utah R.Civ.P. 56(c); *Schurtz v. BMW of N. Am., Inc.,* 814 P.2d 1108, 1111 (Utah 1991). We accord the trial court's legal conclusions no deference, but review them for correctness. *Schurtz,* 814 P.2d at 1112.

The controlling legal issue before us is whether the trial court correctly concluded that the 1933 Act permits the state of Utah to levy taxes on revenues from plaintiffs' leases in the Aneth Extension. Plaintiffs argue that this conclusion was in error, despite the fact that prevailing federal constitu-

---

1. Specifically, the 1933 Act provides:
   Should oil or gas be produced in paying quantities within the lands hereby added to the Navajo Reservation, 37½ per centum of the net royalties accruing therefrom derived from tribal leases shall be paid to the State of Utah: *Provided,* That said 37½ per centum of said royalties shall be expended by the State of Utah in the tuition of Indian children in white schools and/or in the building or maintenance

   of roads across the lands described in section 1 hereof, or for the benefit of the Indians residing therein.
   Act of March 1, 1933, ch. 160, 47 Stat. 1418, 1418–19. In 1968, Congress amended this language to provide that the State use the royalty proceeds "for the health, education, and general welfare of the Navajo Indians residing in San Juan County." Act of May 17, 1968, Pub.L. No. 90–306, 82 Stat. 121.

tional doctrine permits such taxation in the absence of an express prohibition by Congress.

Some background is in order. In 1868, a treaty between the United States government and the Navajo Nation established the Navajo Reservation in New Mexico and Arizona. *See* Treaty of June 1, 1868, 15 Stat. 667. The 1933 Act added 552,000 acres of land in Utah to the Navajo Reservation—500,000 acres in the Paiute Strip and 52,000 acres along the Utah–Colorado border known as the Aneth Extension. At various times throughout this history, treaties, executive orders, and acts of Congress were used to create and expand Indian reservations. The terms and conditions for exploitation of minerals on reservation lands, however, were usually covered in separate legislation.

Congress first generally authorized mineral leasing on certain Indian lands in 1891. *See* Act of Feb. 28, 1891, ch. 383, 26 Stat. 795 (codified at 25 U.S.C. § 397) ("1891 Act"); *Cotton Petroleum,* 490 U.S. at 180, 109 S.Ct. at 1709–10, 104 L.Ed.2d at 229. Section 3 of the 1891 Act included a proviso that empowered tribes to enter into mineral leases on lands "occupied by Indians who have bought and paid for the same." Courts interpreted this proviso broadly to include all lands for which tribes had given any consideration, such as money or "a cession or surrender ... of other lands, possessions or rights." *British–American Oil Producing Co. v. Board of Equalization,* 299 U.S. 159, 164, 57 S.Ct. 132, 134, 81 L.Ed. 95, 98 (1936).

As tribes began to enter into lease agreements with non-Indian lessees, the question of states taxing oil and gas production arose. During the first third of this century, the United States Supreme Court applied the intergovernmental tax immunity doctrine to invalidate "state taxes that arguably imposed an indirect economic burden on the Federal Government or its instrumentalities," which was held to include taxes on earnings from contracts with the government. *Cotton Petroleum,* 490 U.S. at 173–74, 109 S.Ct. at 1705–06, 104 L.Ed.2d at 224–25. This doctrine "'was based on the rationale that any tax on income a party received under a contract with the government was a tax on the

contract and thus a tax "on" the government because it burdened the government's power to enter into the contract.'" *Id.* at 174, 109 S.Ct. at 1706, 104 L.Ed.2d at 225 (quoting *South Carolina v. Baker,* 485 U.S. 505, 518, 108 S.Ct. 1355, 1364, 99 L.Ed.2d 592, 606 (1988)). Such burdening of the federal government without its express permission was held to be constitutionally impermissible. *See id.* 490 U.S. at 174–75, 109 S.Ct. at 1706–07, 104 L.Ed.2d at 225–26.

In 1922, on the basis of the intergovernmental tax immunity doctrine, the Supreme Court invalidated a state tax on income received by a non-Indian lessee from oil production on Indian land. *Gillespie v. Oklahoma,* 257 U.S. 501, 506, 42 S.Ct. 171, 172, 66 L.Ed. 338, 339–40 (1922). *Gillespie* prohibited state taxation of revenues from oil and gas leases on Indian lands unless Congress expressly authorized such taxes. *See Cotton Petroleum,* 490 U.S. at 174–75, 109 S.Ct. at 1706–07, 104 L.Ed.2d at 225–26. In 1924, Congress expressly provided that states could tax oil and gas production on lands that are subject to leasing under the proviso to section 3 of the 1891 Act—lands "occupied by Indians who have bought and paid for the same." *See* The Leasing Act of 1924, ch. 210, 43 Stat. 244 (codified at 25 U.S.C. § 398). Furthermore, in 1927, Congress expressly provided for taxation on leases within reservations created by executive order. *See* The Indian Oil and Gas Act of 1927, ch. 299, § 3, 44 Stat. 1347 (codified at 25 U.S.C. § 398c).

■ The Supreme Court overruled *Gillespie* in 1938. *Helvering v. Mountain Producers Corp.,* 303 U.S. 376, 386–87, 58 S.Ct. 623, 627–28, 82 L.Ed. 907, 916–17 (1938). Thereafter, states were allowed to impose nondiscriminatory taxes on non-Indian lessees on Indian lands unless Congress prohibited such taxation, either expressly or impliedly. *See Cotton Petroleum,* 490 U.S. at 173–75, 109 S.Ct. at 1705–07, 104 L.Ed.2d at 224–26. As a result, the 1938 Act, under which the leases here were issued, allows Utah to tax the interests in oil and gas leases on the Aneth Extension absent a showing of an intention by Congress, either express or implied, to preempt Utah's taxing power. *See id.* at

175–76, 109 S.Ct. at 1707–08, 104 L.Ed.2d at 225–27.

■ Preemption analysis "starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576, 595–96 (1981) (citing *Rice v. Sante Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447, 1451–52 (1947)). Accordingly, the burden is on the party claiming preemption to show a clear congressional intention to oust the state from the exercise of powers otherwise available to it. *See Wisconsin Public Intervenor v. Mortier,* — U.S. —, —, 111 S.Ct. 2476, 2483, 115 L.Ed.2d 532, 543 (1991) (citing *Rice,* 331 U.S. at 230, 67 S.Ct. at 1152, 91 L.Ed. at 1451–52; *Motor Vehicle Mfrs. Ass'n of U.S. v. Abrams,* 899 F.2d 1315, 1319 (2d Cir.1990)). This intention may be express or implied, but "it is not lightly to be presumed." *Greater Wash. Bd. of Trade v. District of Columbia,* 948 F.2d 1317, 1320 (D.C.Cir.1991) (citing *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 522, 101 S.Ct. 1895, 1905–06, 68 L.Ed.2d 402, 416 (1981); *New York Dep't of Social Servs. v. Dublino,* 413 U.S. 405, 413, 93 S.Ct. 2507, 2512–13, 37 L.Ed.2d 688, 694–95 (1973)).

■ Plaintiffs argue that by leaving the 1933 Act silent on the question of state taxation, Congress demonstrated an intention to affirmatively incorporate into that Act the then-governing *Gillespie* rule; *viz.,* that mineral leases on federal lands, including Indian reservations, were constitutionally exempt from state taxation absent an express waiver by Congress. We conclude, however, that more is required. Plaintiffs must demonstrate not only that there was an intention to incorporate the *Gillespie* rule, but that the 1933 Act intended to preserve the nontaxability of interests in mineral leases on the Aneth Extension, even should *Gillespie* be eventually overruled.

We find no such clear intention, either express or implied. All we have is a congressional act directed at another subject—the addition of land to the Navajo Reservation—which is silent on the question of state taxation of revenues from mineral leases, a silence that under post–1938 case law is to be construed as permitting taxation. *See Cotton Petroleum,* 490 U.S. at 175, 109 S.Ct. at 1706–07, 104 L.Ed.2d at 225–26. For the needed expression of an intent to preempt, plaintiffs rely entirely on the fact that the 1933 Act was passed in an environment that was fixed by *Gillespie,* a long-invalidated constitutional doctrine abolished more than fifteen years before the parties entered into the first lease in question. We are unwilling to base a finding of congressional preemption of a state's power to tax on so weak a reed.

The order of the district court granting summary judgment in favor of defendants is hereby affirmed.

STEWART, Associate C.J., HOWE, DURHAM, JJ., and LEONARD H. RUSSON, Court of Appeals Judge, concur.

HALL, J., does not participate herein; RUSSON, Court of Appeals Judge, sat.