695 F.2d 428
 1984 A.M.C. 2112
 Luis Trelles CRUZ, et al., Plaintiffs,
v.
ZAPATA OCEAN RESOURCES, INC., Calypso Tuna, Inc., City of
Lisbon, Inc., Maria Elizabeth, Inc. and West
Indies Tuna, Inc., Defendants
Third-Party Plaintiffs-Appellants,
v.
UNITED STATES of America, Third-Party Defendant-Appellee.
Alfredo A. CASTILLO, et al., Plaintiffs,
v.
ZAPATA OCEAN RESOURCES, INC., et al., Defendants Third-Party
Plaintiffs-Appellants,
v.
UNITED STATES of America, Third-Party Defendant-Appellee.
 Nos. 79-3701 and 79-3704 to 79-3708.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 7, 1981.
Decided Dec. 29, 1982.
 
 Paula L. Lehman, Gray, Cary, Ames & Frye, San Diego, Cal., for Cruz and Castillo.
 Dennis L. Bryant, San Francisco, Cal., for Zapata Ocean Resources.
 Appeal from the United States District Court for the Southern District of California.
 Before BROWNING, Chief Judge, NORRIS, Circuit Judge, and TASHIMA,* District Judge.
 BROWNING, Chief Judge:
 
 
 1
 The question presented is whether the Secretary of Commerce (the Secretary) acted lawfully in issuing regulation 50 C.F.R. Sec. 258.8(g) barring consideration of claims submitted by non-resident alien crew members under section 7 of the Fishermen's Protective Act, 22 U.S.C. Sec. 1977, for losses resulting from seizure of a fishing vessel by a foreign nation. We conclude that the Secretary exceeded his authority, and the regulation is therefore void.
 
 
 2
 The Fishermen's Protective Act (the Act) was enacted in 1954 in response to the seizure of privately owned vessels of the United States by foreign countries asserting claims to territorial waters or the high seas not recognized by the United States. S.Rep.No. 2214, 83d Cong., 2d Sess., reprinted in 1954 U.S.Code Cong. & Ad.News 3382. Section 2 of the Act, 22 U.S.C. Sec. 1972, directed the Secretary of State to secure the prompt release of any such vessel and its crew. Section 3, 22 U.S.C. Sec. 1973, provided for the reimbursement of the owners of the vessel by the Secretary of State for fines paid to secure such releases. Section 4, 22 U.S.C. Sec. 1974, excepted seizures made by a country at war with the United States, or made in accordance with a treaty to which the United States is a party. Section 5, 22 U.S.C. Sec. 1975, directed the Secretary of State to make claims against the foreign countries for amounts expended under the Act because of the seizure of a United States vessel. This provision was added "for the purpose of letting the Secretary of State know that the Congress expects him, eventually, to recover from the foreign country any money expended by the United States under this bill ...." S.Rep.No. 2214, supra, 1954 U.S.Code Cong. & Ad.News at 3385.
 
 
 3
 The Act proved inadequate. Only a small part of the losses suffered by the owners and crews of seized vessels was reimbursed by the Secretary of State and the amounts paid were not recovered from the seizing nations. Meron, The Fishermen's Protective Act: A Case Study in Contemporary Legal Strategy of the United States, 69 Am.J.Int'l L. 290, 292 (1975).
 
 
 4
 The Act was amended in 1968 to correct these deficiencies. Section 3, 22 U.S.C. Sec. 1973, was expanded to provide for the reimbursement not only of fines but also of any "license fees or regulation fee or any other direct charge actually paid to secure release of the vessel and crew." Section 5, 22 U.S.C. Sec. 1975, was amended to require the Secretary of State to immediately notify the foreign country of any payment made under the Act as a result of a seizure, and make claim for the amount paid. If the claim was not paid within 120 days, the Secretary of State was directed to transfer an amount equal to the unpaid claim from funds appropriated for assistance to that country under the Foreign Assistance Act of 1961.
 
 
 5
 A new section, section 7, 22 U.S.C. Sec. 1977, was added authorizing voluntary agreements between the Secretary of Commerce[1] and owners of commercial fishing vessels providing that if a vessel was seized, the Secretary would guarantee the owner all actual costs incurred during seizure and detention, and would guarantee the "owner of such vessel and its crew" the value of fish confiscated and 50 percent of the gross income lost as a result of detention and seizure.[2] The Secretary was to establish fees to be paid by vessel owners at a level adequate to cover costs of administration and one-third of the payments made by the Secretary under the guarantee agreements, the balance to be contributed by the government.
 
 
 6
 Shortly after passage of the 1968 amendments, the Secretary issued regulations implementing Section 7. 50 C.F.R. part 258. The regulations include the following provision: "No claim of any crew member who is not a citizen or an alien legally domiciled in the United States will be considered." 50 C.F.R. Sec. 258.8(g). This limitation was incorporated in guarantee agreements entered into between the Secretary and vessel owners under section 7.
 
 
 7
 In 1975, the Republic of Ecuador seized four American vessels fishing for tuna approximately 100 miles off the Ecuadorian coast. Ecuador claimed a 200-mile fishing limit which was not then recognized by the United States. The seizures resulted in substantial losses to the owners and crews of the vessels through the confiscation of their catches of tuna and the loss of fishing time.
 
 
 8
 Fifteen non-resident alien crew members of the four vessels sued Zapata Ocean Resources, Inc., parent of the four corporations that owned the seized vessels, for the alien crew members' share of these losses. Because the vessel owners had entered into guarantee agreements with the Secretary under section 7 of the Act, Zapata, joined by the four vessel owners, filed third-party claims against the United States for reimbursement.
 
 
 9
 Several alien crew members prevailed against Zapata on motion for summary judgment and Zapata settled the claims of the others. The district court granted summary judgment for the United States on Zapata's reimbursement claim, concluding that it was barred by regulation 50 C.F.R. Sec. 258.8(g), quoted above, because the underlying claims were not made by citizens or domiciliaries of the United States. Zapata appealed.
 
 
 10
 As a contemporary interpretation of the Act by those charged with its administration, the challenged regulation is entitled to great weight. Nonetheless, we are obliged to reject the agency's interpretation of the statute underlying the regulation if "there are compelling indications that it is wrong." Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969). We conclude that the regulation is inconsistent with the intent of Congress as indicated by the great weight of the available evidence.
 
 
 11
 Although it is clear from the language of the statute and the provision of 46 U.S.C. Sec. 11 that the vessel owner must be a citizen to qualify for compensation, there is nothing in the statute to suggest the same is true of members of the "crew." The latter collective term is used in section 7 to identify those to whom compensation is to be paid without differentiating among individual members of the "crew" by nationality or in any other way. Moreover, the same term is also used in section 2, 22 U.S.C. Sec. 1972, to identify those whose health and welfare the Secretary of State is directed to protect and whose release from detention the Secretary of State is directed to secure.[3] It is highly unlikely that Congress intended the Secretary of State to protect the welfare and secure the release of citizens and domiciliary aliens among the crew of an American fishing vessel seized by a foreign country, but to ignore the mistreatment and imprisonment of members of the same crew who were non-resident aliens.
 
 
 12
 The intended beneficiaries of section 7 were sometimes referred to during the legislative process as "U.S. fishermen" or "nationals" or "citizens" of the United States. But in most instances the references were clearly to the vessel owner, not to the crew. Moreover, the terms accurately described most members of crews of U.S. fishing vessels, and nowhere in the legislative record is there any suggestion that these words were chosen with a conscious intention to exclude those crew members who might be aliens.
 
 
 13
 The purpose of the Act was to encourage American fishing vessels to continue to operate in disputed waters so the United States might continue to share the important food resources found there, and in order to advance the claim made by the United States under international law to the right of free access to these waters.[4] Interpreting the Act to afford compensation to all crew members for losses resulting from seizure would best serve the statutory purpose by affording the greatest encouragement to American fishing vessel owners to risk entry into the disputed waters. Denying alien seamen such compensation would necessarily reduce the pool of seamen willing to serve. Moreover, depending upon the terms of the contract between the vessel owner and the crew, denial of compensation to alien members of the crew might result in transferring the loss to the vessel owner (as it has in this case) thus discouraging the owner even more directly from continuing to fish in disputed waters.
 
 
 14
 The government argues that the structure of the Act and its legislative history indicate Congress intended that payments made under the Act should be recovered from the offending foreign nation. The government further argues that it is an established principle of international law that a state may pursue claims against a foreign state only on behalf of its own nationals. The government concludes that since under international law the United States could not claim from the offending foreign nation losses sustained by seamen who were not nationals of the United States, the Secretary acted in accordance with Congress's intent in refusing to compensate aliens for their losses.
 
 
 15
 Congress did not link payment to vessel owners and crew to recovery from the foreign nation as closely as the government's argument suggests. Admittedly, the government's obligation to compensate the vessel owner and crew is not conditioned on recovery of the losses from the foreign country. The Department of State has been reluctant to pursue such claims, not because they could not be recovered, but because the Department believed the more promising route to a solution of the problem was negotiation of a settlement recognizing this country's right of access to the waters in question, thus ending the seizures. The Department believed pursuing individual claims or setting them off against foreign aid otherwise available would impede rather than further the negotiation process.[5]
 
 
 16
 At the Department of State's request, it was given the option of forgoing any effort to collect such claims either by diplomatic measures or by set-off against foreign aid.[6] It is not clear that any such claims have in fact been made against any foreign country. We are informed that none has ever been collected. Congress was aware of the failure of the collection program.[7] It seems unreasonable to infer that Congress intended to limit payments to vessel owners and crews for losses sustained in the seizure of their vessels on the basis of what theoretically might be recovered through an international claims procedure Congress knew to be wholly ineffective.
 
 
 17
 Even if it is assumed Congress intended to pay losses of crew members only if those losses could be claimed by the United States from the offending foreign nations, the government's argument is faulty for another reason. The argument's further necessary premise is that as a matter of international law the United States lacked standing to pursue the claims of alien seamen serving on American flag vessels. This premise is either wrong or so questionable that it cannot be assumed as a basis for an inference of congressional intent.
 
 
 18
 Under international customary law, a state may not present a claim on behalf of a national of another state.[8] As the International Court of Justice has noted, however, there are "important exceptions to the rule."[9] There is persuasive authority that alien seamen serving on a nation's vessels constitute such an exception.
 
 
 19
 In In re Ross, 140 U.S. 453, 472, 11 S.Ct. 897, 903, 35 L.Ed. 581 (1891), Justice Field described the rights of a British citizen serving as a seaman on an American vessel in these words:
 
 
 20
 The national character of the petitioner, for all the purposes of the consular jurisdiction, was determinable by his enlistment as one of the crew of the American ship Bullion. By such enlistment he becomes an American seaman .... Although his relations to the British government are not so changed that, after expiration of his enlistment on board of the American ship, that government may not enforce his obligation of allegiance, and he on the other hand may not be entitled to invoke its protection as a British subject, that relation was changed during his service of seaman on board of the American ship under his enlistment. He could then insist upon treatment as an American seaman, and invoke for his protection all power of the United States which could be called into exercise for the protection of seamen who were native born.
 
 
 21
 Justice Field's definition of an "American seaman" as including an alien serving on the crew of an American vessel has been adopted by our Department of State,[10] and followed in practice. "Claims to a right of protection by the flag-state of foreign seamen during their employment have been advanced with some consistency by the United States." 1 G. Schwarzenberger, International Law 593 (1957).[11] Conversely, the United States has recognized the right of foreign governments to present claims on behalf of seamen of nationalities other than their own serving on their flag-carriers.[12]
 
 
 22
 The case for diplomatic intervention is particularly strong where, as here, the losses are not purely personal but affect the realization of the nation's economic and political objectives. See Meron, supra, at 306. Underlying this legislation is the assumption that foreign nations that seized and detained American fishing vessels in the disputed waters bore full responsibility for redressing losses sustained by the owner of those vessels and their crews. It would surely be far-fetched to infer that Congress did not intend the United States to pursue such claims against offending nations to the full extent of losses incurred where standing to do so was arguably present.
 
 
 23
 For this reason and those earlier stated we conclude the regulation limiting payments under the Fishermen's Protective Act to losses sustained by those members of the crew of seized vessels who are citizens and resident aliens is inconsistent with the Act and does not reflect its purpose.
 
 
 24
 Because the district court concluded the regulation was valid and barred Zapata's claim, the court did not reach other grounds relied upon by the government. These issues should be considered initially below.
 
 
 25
 Reversed and remanded for further proceedings.
 
 
 
 *
 Honorable A. Wallace Tashima, District Judge, United States District Court for the Central District of California, sitting by designation
 
 
 [1]
 Congress originally placed the responsibility for administering section 7 with the Secretary of the Interior. In 1972 the section was amended to substitute the Secretary of Commerce for the Secretary of the Interior. Pub.L.No. 92-594, Sec. 2, 86 Stat. 1313 (1972)
 
 
 [2]
 Section 7 provides in relevant part:
 (a) The Secretary, upon receipt of an application filed with him ... by the owner of any vessel of the United States which is documented or certificated as a commercial fishing vessel, shall enter into an agreement with such owner subject to the provisions of this section and such other terms and conditions as the Secretary deems appropriate. Such agreement shall provide that, if said vessel is seized by a foreign country and detained under the conditions of section 1972 of this title, the Secretary shall guarantee--
 (1) the owner of such vessel for all actual costs ... incurred by the owner during the seizure and detention period and as a direct result thereof, as determined by the Secretary, resulting ... (B) from the loss or confiscation of such vessel, gear, or equipment ...;
 (2) the owner of such vessel and its crew for the market value of fish caught before seizure of such vessel and confiscated or spoiled during the period of detention; and
 (3) the owner of such vessel and its crew for not to exceed 50 per centum of the gross income lost as a direct result of such seizure and detention ....
 22 U.S.C. Sec. 1977.
 
 
 [3]
 Section 1972 reads in pertinent part:
 If--
 (1) any vessel of the United States is seized by a foreign country on the basis of claims in territorial waters or the high seas which are not recognized by the United States;
 * * *
 and there is no dispute as to the material facts with respect to the location or activity of such vessel at the time of such seizure, the Secretary of State shall immediately take such steps as are necessary--
 (i) for the protection of such vessel and for the health and welfare of its crew;
 (ii) to secure the release of such vessel and its crew ....
 
 
 [4]
 See Foreign Seizures of U.S. Fishing Vessels, 1967: Hearings on H.R. 4153, 4346, 4350, 4451, 4452, 9015, 5148, 6785 Before the Subcomm. on Fisheries and Wildlife Conservation of the House Comm. on Merchant Marine Fisheries, 90th Cong., 1st Sess. 43 (1967)(statement of August Felando, General Manager, American Tunaboat Association) [hereinafter cited as Hearings]; id. at 60 (testimony of Donald McKernan, Special Assistant for Fisheries and Wildlife, the Department of State); id. at 75-78 (statement of Harold E. Crowther, Director for International Affairs, Bureau of Commercial Fisheries, Department of the Interior); H.R.Rep.No. 1566, 90th Cong., 2d Sess., reprinted in 1968 U.S.Code Cong. & Ad.News 3275, 3278-79; H.R.Rep.No. 625, 90th Cong., 1st Sess. 10-11 (1967); S.Rep.No. 2214, 83d Cong., 2d Sess., reprinted in 1954 U.S.Code Cong. & Ad.News 3382, 3383; id. at 3386 (letter from Orme Lewis, Assistant Secretary of the Interior, to Chairman Bricker, July 20, 1954); 114 Cong.Rec. 8854, 8863 (1968)(testimony of Sen. Holland)
 The principal purpose of the Act is summarized by Meron, quoting a letter from William B. Macomber of the Department of State to Chairman Garmatz, June 22, 1967, Hearings, supra, at 13.
 ... [T]he motivation for the Fishermen's Protective Act was the fear that, should the U.S. fishing industry abstain from fishing off the coasts of the seizing countries, the rights and the positions of the United States in the jurisdictional disputes between the Government of the United States and the Governments of the Latin American countries concerned (and, potentially, other countries, such as Canada) would be adversely affected. Hence the need to reimburse the owners of fishing vessels for losses suffered, and to encourage them not to change their fishing practices by moving to less productive but safer waters. Thus, the Department of State declared that
 It is the position of this Government to support the free operations of our fishing vessels outside national fisheries jurisdiction extending to a distance of not more than twelve miles from the coast of all countries, subject only to international law and agreements. It is also the policy of this Government to support the development of the American fishing industry. Nevertheless, unless effective protection is afforded to American fishing vessels operating in zones of the high seas regarded by foreign governments as within their national jurisdiction on the basis of claims we consider to be without foundation in international law, both the legal rights espoused by this Government and the continued development of the American fishing industry will suffer.
 Meron, The Fishermen's Protective Act: A Case Study in Contemporary Legal Strategy of the United States, 69 Am.J.Int'l L. 290, 299 (1975).
 
 
 [5]
 See Hearings, supra note 4, at 12 (letter from William B. Macomber, Jr., Assistant Secretary for Congressional Relations, Department of State, to Chairman Garmatz, June 22, 1967); id. at 62, 64, 70 (testimony of Donald McKernan, Special Assistant for Fisheries and Wildlife, Department of State); H.R.Rep.No. 1566, supra note 3, 1968 U.S.Code Cong. & Ad.News at 3286-89 (letter from H.G. Torbert, Jr., Acting Assistant Secretary for Congressional Relations, Department of State, to Chairman Garmatz, June 11, 1968); H.R.Rep. 625, supra note 4, at 19 (letter from William B. Macomber, Jr., Assistant Secretary for Congressional Relations, Department of State, to Chairman Garmatz, June 22, 1967)
 
 
 [6]
 See Hearings, supra note 4, at 13 (letter from William B. Macomber, Jr., Assistant Secretary of State, to Chairman Garmatz, June 22, 1967)
 
 
 [7]
 Hearings, supra note 4, at 16-17 (testimony of Hon. Thomas M. Pelly); id. at 18 (testimony of Hon. Ed Reinecke); id. at 68-71 (testimony of Donald McKernan, Special Assistant for Fisheries and Wildlife, Department of State); H.R.Rep.No. 1566, supra note 4, 1968 U.S.Code Cong. & Ad.News at 3279-80; 114 Cong.Rec. 8854, 8855 (1968)(testimony of Sen. Magnuson)
 
 
 [8]
 The Nottebohm Case (Liechtenstein v. Guatemala), 1955 I.C.J. 4, 13, 23-4, 26; Restatement (Second) of Foreign Relations Law of the United States Secs. 26, 174 (1965); E. Borchard, Diplomatic Protection of Citizens Abroad Sec. 8, at 16 (1922); Panel discussion, Nationality of Claims--Individuals, Corporations, Stockholders, 63 Am.Soc. of Int'l L.Proc. 30, 50 (1969) (comments of Richard Lillich); R. Lillich & G. Christenson, International Claims: Their Preparation and Presentation 7-9 (1962)
 
 
 [9]
 Reparations for Injuries Suffered in the Service of the United Nations, 1949 I.C.J. 181, cited in 1 G. Schwarzenberger, International Law 592 (1957)
 
 
 [10]
 The Foreign Service Regulations define the term "American seamen" to include: "(a) Seamen who are native-born or fully naturalized citizens of the United States" and "(b) Aliens who have acquired and maintained the character of American seamen." Foreign Ser.Reg.U.S. XVI-2, nn. 1, 2, & 3, June 1941, cited in 4 G. Hackworth, Digest of International Law Sec. 446, at 883-84
 
 
 [11]
 See also E. Borchard, supra note 8, Sec. 206, at 475-78; 3 G. Hackworth, Digest of International Law Sec. 257, at 417-20 (1942); 4 id. Sec. 446, at 883-85 (1942); 5 id. Sec. 541, at 816-19 (1943); 2 C. Hyde, International Law Chiefly as Interpreted and Applied by the United States Sec. 394, at 1179-80 (1947); 3 J. Moore, International Law Digest Sec. 484, at 795-800 (1906); P. Weis, Nationality and Statelessness in International Law 43 (1956); 8 M. Whiteman, Digest of International Law Sec. 38, at 1264-65 (1967); Panel discussion, Nationality of Claims--Individuals, Corporations, Stockholders, supra note 8
 After the American steamer, President Hoover, was bombed outside Shanghai, the Department of State took the position that "irrespective of nationality of surviving members of crew, they are, as American seamen on American vessel [sic], regarded as entitled to this Government's assistance." Manuscript, Dep't of State, file 393.115 President Hoover/76, cited in 3 G. Hackworth, supra, at 418.
 In another case, Mexico seized an American flag-vessel and imprisoned the crew. Although one of the crew, McCready, was unable to demonstrate United States citizenship, the United States was permitted to espouse his claim for compensatory damages. The Umpire stated that seamen "serving in the naval or mercantile marine under a flag not their own are entitled, for the duration of that service, to the protection of the flag under which they serve." Reprinted in 3 J. Moore, International Arbitration 2536-37, cited in Schwarzenberger, supra note 9, at 593.
 
 
 [12]
 A joint Anglo-American Commission recognized claims presented by Canada on behalf of seamen of non-Canadian nationality and recommended payment of compensatory damages resulting from the sinking by a United States Coast Guard vessel of the I'm Alone, a Canadian flag-vessel. See Joint Final Report of the Commissioners, Jan. 5, 1935, Dep't of State, Arbitration Ser. 2 (7), cited in 5 G. Hackworth, supra note 11, at 819
 The following communication from the Department of State to the American Consulate in Marseilles is also instructive:
 ... you should take up Mr. Reeves' passport and advise him that during the time he is acting as the master of a foreign vessel he cannot expect to receive the protection of the United States and can look for protection only to the country under whose flag he serves.
 Manuscript, Dep't of State, file 130 Reeves, George E., cited in 4 G. Hackworth, supra note 11, at 885.