**BLACKFEET TRIBE OF INDIANS,**
Plaintiff-Appellant,

v.

**STATE OF MONTANA,** Director of the Montana Department of Revenue, Glacier County, Montana, and Pondera County, Montana, Defendants-Appellees.

No. 81–3041.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted En Banc Nov. 16, 1983.

Decided April 3, 1984.

Richard B. Collins, Boulder, Colo., for plaintiff-appellant.

Helena S. Maclay, Missoula, Mont., Chris D. Tweeten, Asst. Atty. Gen., Helenea, Mont., Deirdre Boggs, Missoula, Mont., for defendants-appellees.

Before GOODWIN, WALLACE, KENNEDY, ANDERSON, FLETCHER, FARRIS, PREGERSON, CANBY, BOOCHEVER, NORRIS and REINHARDT, Circuit Judges.

FLETCHER, Circuit Judge:

This case involves the scope of state authority to tax the proceeds of tribal mineral leases, and requires that we examine a series of congressional enactments regulating the leasing of tribal land for oil and gas production.

Between 1932 and 1968, the Blackfeet Tribe executed 125 leases authorizing the mining of oil and gas on tribal land located within the Blackfeet Indian Reservation. Approximately 12 of the leases were made under the authority of the Act of February 28, 1891, ch. 383, 26 Stat. 795, as amended by the Act of May 29, 1924, ch. 210, 43 Stat. 244 (codified at 25 U.S.C. §§ 397–98 (1976)). The balance of the leases were made under the authority of the Act of May 11, 1938, ch. 198, 52 Stat. 347 (codified at 25 U.S.C. §§ 396a–396g (1976)). All 125 leases remain in operation today and will continue until the oil and gas supply is exhausted. The Tribe is paid royalties calculated on the basis of the amount of gas or oil produced under the leases. The State of Montana imposes four distinct taxes on the Tribe's royalty interests, without distinguishing between the royalties collected pursuant to 1938 Act leases and the royalties collected under 1891 Act leases. *See* Mont.Code Ann. §§ 15–36–101 to –121 (1981) (Oil and Gas Severance Tax); Mont. Code Ann. §§ 15–38–101 to –109 (1981) (Resource Indemnity Trust Tax); Mont.Code Ann. §§ 82–11–131 to –132 (1981) (Oil and Gas Conservation Tax); Mont.Code Ann. §§ 15–23–601 to –612 (1981) (Oil and Gas Net Proceeds Tax). Montana assesses the Tribe's share of all four taxes against the producer-lessees, who then deduct it from the royalties payable to the Tribe.

In 1977, the Solicitor of the Department of the Interior issued an opinion concluding that Montana was entitled to tax the production of oil and gas under 1891 Act leas-

es, but could not tax tribal proceeds from 1938 Act leases. *Tax Status of The Production of Oil and Gas from Leases of The Fort Peck Tribal Lands Under The 1938 Mineral Leasing Act,* 84 Interior Dec. 905 (1977).[1] Montana continued to assess taxes against the Tribe's royalty interests under all 125 leases. In 1978, the Tribe filed an action in federal court seeking to enjoin Montana's taxation of tribal royalties. The district court, 507 F.Supp. 446, entered summary judgment for the State of Montana, holding that the 1924 amendment to the 1891 Act expressly authorized state taxation of production of oil and gas on Indian lands, and that the 1938 Act left that authority undisturbed.

A panel of this court affirmed the district court's decision. We ordered a rehearing *en banc* in order to resolve a conflict between the opinion and our decision in *Crow Tribe of Indians v. State of Montana,* 650 F.2d 1104 (9th Cir.1981), *amended,* 665 F.2d 1390 (9th Cir.), *cert. denied,* 459 U.S. 916, 103 S.Ct. 230, 74 L.Ed.2d 182 (1982).

Montana argues on appeal that Congress consented to the imposition of its taxes in the Act of May 29, 1924. The Tribe concedes that the 1924 Act expressly consented to taxation of oil and gas production on Indian land, but argues that the 1924 Act was implicitly repealed by section 7 of the Act of May 11, 1938.[2] Alternatively, the Tribe argues that the consent to taxation found in the 1924 Act is inapplicable to production of oil and gas under leases governed by the 1938 Act. The legislative

history of the two statutes contains little explicit guidance, and resort to conventional "canons of construction" yields inconsistent results.[3] Our resolution of this difficult issue requires a thorough analysis of the language, purpose and historical contexts of both statutory schemes.

I

■ We begin with the well settled principle that state taxation of tribal income from activities carried on within the boundaries of the reservation is impermissible unless Congress has expressly consented to the imposition of the tax. *See Bryan v. Itasca County,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976); *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976). We must resolve whether the 1924 Act explicitly consented to the taxes here at issue. The consent to taxation contained in the 1924 Act was part of an amendment to the Act of February 28, 1891, ch. 383, 26 Stat. 794, which was itself an amendment to the General Allotment Act of February 8, 1887, ch. 119, 24 Stat. 388. The 1924 Act was one of a series of similar statutes providing for non-Indian leasing and development of Indian lands within the context of the policies embodied in the General Allotment Act. *See, e.g.,* Appropriations Act of June 30, 1919, ch. 4, § 26, 41 Stat. 3, 31–34 (codified as amended at 25 U.S.C. § 399 (1976)); Act of September 20, 1922, ch. 347, 42 Stat. 857 (codified at 25 U.S.C. § 400 (1976)).[4] Our analysis therefore begins

---

**1.** Montana insists that no deference is due the interpretation of the Interior Department because its position in the six years since 1977 contradicts its position during the prior fifty years. Montana greatly overstates its case. Only two unpublished opinions, one in 1956 and a second in 1966, contradict the Department's current interpretation. *See infra* Section III. The other decisions on which Montana relies were either decided prior to the enactment of the 1938 leasing statute or concerned the taxation of leases issued under prior statutes. *See* 84 Interior Dec. at 911.

**2.** Section 7 provides: "All Act or parts of Acts inconsistent herewith are hereby repealed."

**3.** The Tribe calls our attention to the canon that Indian legislation is to be construed liberally in favor of Indians and ambiguities to be resolved in their favor. Montana invokes the rule that repeals by implication are disfavored, insisting that courts must construe potentially inconsistent statutes so as to give both statutes effect.

**4.** *See also* Appropriations Act of March 3, 1909, ch. 263, 35 Stat. 781, 783 (codified at 25 U.S.C. § 396 (1976)); Act of April 28, 1924, ch. 135, 43 Stat. 111 (codified at 25 U.S.C. § 401 (1976)); Act of April 17, 1926, ch. 156, 44 Stat. 300 (codified at 25 U.S.C. § 400a (1976)); Act of March 3, 1927, ch. 299, 44 Stat. 1347 (codified at 25 U.S.C. § 398a (1976). *See generally* United States Department of the Interior, *Federal Indi-*

with the program reflected in the General Allotment Act of 1887, and Congress's efforts to effectuate it.

The primary purpose of the General Allotment Act was the speedy assimilation of the Indians. *See generally* 17 Cong.Rec. 1630–35, 1762–64 (1886); F. Cohen, *Handbook of Federal Indian Law* 128–32 (1982). Each Indian was to receive an allotment of land, to be held in trust for 25 years.[5] The Forty-Ninth Congress envisioned a period during which the Indians would be "civilized" and the tribal system destroyed, after which the Indians would succeed to fee ownership of their lands and all of the privileges and obligations of citizenship. *See, e.g.,* 17 Cong.Rec. 1632 (1886) (remarks of Mr. Maxey); *id.* at 1763 (remarks of Mr. Dawes); F. Cohen, *supra,* at 131–32; G.D. Taylor, *The New Deal and American Indian Tribalism* 4–5 (1980). The Act further provided for the sale of surplus land, and the use of the proceeds for the education and civilization of members of the tribes.[6]

In 1891, Congress responded to public pressure to open reservation land for settlement and mining by amending the allotment act to permit short term leases of unallotted lands and lands allotted to aged and disabled allottees. *See* Act of February 28, 1891, ch. 383, § 3, 26 Stat. 794, 795; F. Cohen, *supra,* at 134–35.[7] In 1910, Congress enacted a measure permitting short term leasing of allotted lands and directing the Secretary of the Interior to supervise the expenditure of funds earned under the leases.[8] *See* Act of June 25, 1910, ch. 431, § 4, 36 Stat. 855, 856. The Indian Appropriations Act of 1919 included comprehensive provisions permitting long term mineral leasing of unallotted lands in western states. *See* Appropriations Act of June 30, 1919, ch. 4, § 26, 41 Stat. 3, 31–34 (codified as amended at 25 U.S.C. § 399 (1976)). The Act of May 29, 1924, ch. 210, 43 Stat. 244, extended the terms of 1891 Act oil and gas production leases from a ten-year period to "as long as oil or gas shall be found in paying quantities," authorized the Secretary of the Interior to enter into further oil and gas leases for the extended period, and consented to state taxation of mineral production on unallotted lands "bought and paid for" by the Indians. *See British-American Oil Producing Co. v. Board of Equalization,* 299 U.S. 159, 57 S.Ct. 132, 81 L.Ed. 95 (1936).[9] Between 1920 and

*an Law* 115–127 (1958); F. Cohen, *Handbook of Federal Indian Law* 132–43, 528–29 (1982).

**5.** The trust period was subject to extension by the President, and was subsequently extended. *See* Appropriations Act of June 21, 1906, ch. 3504, 34 Stat. 325, 326 (codified at 25 U.S.C. § 391 (1976)).

**6.** *See* F. Cohen, *supra* note 4, at 131–32. During the first ten years of allotment, 55 million acres of "surplus" land were sold to white settlers. *See* G.D. Taylor, *The New Deal and American Indian Tribalism* 5 (1980). *See also* 78 Cong. Rec. 11134–37 (1934) (debate on effect of S. 3645, 73d Cong., 2d Sess., on surplus lands provision of 1887 Act).

**7.** Minor relaxations in the restrictions on such leases were enacted over the next 20 years. *See* Appropriations Act of Aug. 15, 1894, ch. 290, 28 Stat. 286, 305; Appropriations Act of May 31, 1900, ch. 598, § 1, 31 Stat. 221, 229 (codified at 25 U.S.C. § 395 (1976)). *See generally* F. Cohen, *supra* note 4, at 135.

**8.** *See* G.D. Taylor, *supra* note 6, at 6:
 During the trust period the allotted land could be leased, and Indians were encouraged to lease their lands for relatively modest fees. In the case of the Civilized Tribes in Oklahoma, local real estate agents selected the sites for allotment, then rented the land from the Indians and sublet it at a profit to white farmers. In other cases the [Bureau of Indian Affairs], as trustee, administered the leases but failed to ensure that the Indians received the maximum possible rent from the land.

**9.** In *British-American Oil Producing Co. v. Board of Equalization,* 299 U.S. 159, 164–65, 57 S.Ct. 132, 134–35, 81 L.Ed. 95 (1936), the Supreme Court construed the "bought and paid for" language to apply to unallotted land within treaty reservations, including unallotted reserved mineral rights in or under allotted lands. The Court held that the 1924 Act's consent to taxation extended to mineral leases issued under the Appropriations Act of June 30, 1919, ch. 4, § 26, 41 Stat. 3, 32 (codified as amended at 25 U.S.C. § 399 (1976)). *Id.* at 166, 57 S.Ct. at 135. We believe that the *British-American* Court's interpretation of the statutory language of the 1924 Act is problematic. *See* F. Cohen, *supra* note 4, at 409 n. 40, 529 n. 5. We follow it with respect to leases issued before the enactment of the 1938 statute. In view of our interpretation of

1930, several other statutes were enacted to permit the leasing of additional categories of reservation land.[10]

All of these leasing provisions had a number of common features. The leases were regulated and approved by the Secretary of the Interior.[11] The proceeds were paid to the Secretary of the Interior and disbursed, by congressional appropriation, for the benefit of the Indians. The tribes had no authority to police or cancel leases or to direct the purposes for which revenue earned under the leases would be spent. *See generally* F. Cohen, *supra*, at 533–34.

The legislative history of these enactments reflects certain common themes. Congress evinced concern about the increasing size of Indian appropriations, and desired that a greater portion of the federal expenditures be made from the Indians' funds. *See, e.g.*, H.Rep. No. 1791, 69th Cong.2d Sess. (1927); 68 Cong.Rec. 4574–75 (1927) (remarks of Mr. Letts); 58 Cong. Rec. 175 (1919) (remarks of Mr. Snyder); *id.* at 207–08 (colloquy); F. Cohen, *supra*, at 135–36. Representatives expressed frustration at the fact that the assimilation sought under the General Allotment Act failed to proceed with the contemplated dispatch. *See, e.g.*, 68 Cong.Rec. 4704 (1927) (remarks of Mr. Morrow); 58 Cong. Rec. 174–75 (1919) (remarks of Mr. Snyder). States complained that reservation lands were remaining tax exempt for too long a period, *see* 58 Cong.Rec. 180–81 (1919) (remarks of Mr. McKeown); *id.* at 184 (remarks of Mr. Howard); 45 Cong.Rec. 6079 (1910) (colloquy), and urged strenuously that the lands be opened for increased non-Indian development and settlement. *See, e.g.*, 68 Cong.Rec. 4575 (1927) (remarks of Mr. Frear); 58 Cong.Rec. 181 (1919) (remarks of Mr. McKeown); *id.* at 216 (remarks of Mr. Carter); 45 Cong.Rec. 6096 (1910) (remarks of Mr. McGuire); F. Cohen, *supra*, at 128, 134–35.

The 1924 Act was responsive to these concerns. By extending the period of oil and gas production leases it encouraged further non-Indian development of reservation lands. The revenue thereby produced became available to reimburse the Treasury for its appropriations for the Indians' "education" and "civilization"—measures that Congress hoped would speed assimilation.[12] The consent to taxation placated states impatient with the Indians' tax-exempt status.[13] *See* S.Rep. No. 546, 68th Cong., 1st Sess. (1924); 65 Cong.Rec. 6844 (1924) (Remarks of Mr. Hastings); *see generally* F. Cohen, *supra*, at 134–42, 533–34; United States Department of the Interior, *Federal Indian Law* 125–26 (1958).

In 1934, Congress repudiated the allotment program. After studying its im-

---

the 1938 Act, we need not reach the question of whether the Court's 1936 analysis applies to the 1938 Act. *See id.* at 529 n. 5.

**10.** *See* Act of March 3, 1921, ch. 119, 41 Stat. 1225, 1249 (Quapaw Reservation); Act of March 3, 1921, ch. 120, 41 Stat. 1249, 1250 (Osage Reservation); Act of Sept. 20, 1922, ch. 347, 42 Stat. 857 (codified at 25 U.S.C. § 400 (1976)) (unallotted lands in Fort Peck and Blackfeet Reservations); Act of April 28, 1924, ch. 135, 43 Stat. 111 (codified at 25 U.S.C. § 401 (1976)) (unallotted lands in Kaw Reservation); Act of May 26, 1926, ch. 403, § 6, 44 Stat. 658, 659–60 (Crow Reservation); Act of July 3, 1926, ch. 787, 44 Stat. 894 (codified at 25 U.S.C. § 402a (1976)) (unallotted irrigable lands for farming purposes); Act of March 3, 1927, ch. 299, 44 Stat. 1347 (codified at 25 U.S.C. 398a–398e (1976)) (unallotted lands on executive order reservations). The 1927 Act and both 1921 Acts expressly consented to state taxation; the other four Acts did not.

**11.** Leases entered into under the 1891 Act were to be granted "by authority of the council speaking for such Indians ... subject to the approval of the Secretary of the Interior." Act of Feb. 28, 1891, ch. 383, § 3, 26 Stat. 794, 795. The 1924 Act amended the procedure to provide for leasing at public auction "by the Secretary of the Interior with the consent of the council speaking for such Indians." Act of May 29, 1924, ch. 210, 43 Stat. 244. The 1919 Act made no provision for tribal consent.

**12.** *See generally* 58 Cong.Rec. 173–77 (1919); F. Cohen, *supra* note 4, at 139–41.

**13.** *See generally Loss of Revenue—Tax Exempt Indian Lands:* Hearing on S.Res. 168 before the Senate Comm. on Indian Affairs, 75th Cong., 3d Sess. (1938), *for accounts of unsuccessful state attempts to tax oil and mineral production on reservation lands during the early part of the twentieth century.*

plementation, members of the Congressional Committees on Indian Affairs concluded that the results of the program had become "a scandal and a blot on our name in every part of the world." 78 Cong.Rec. 11727 (1934) (remarks of Mr. Howard). *See also id.* at 11126 (remarks of Mr. King); *id.* at 11743 (remarks of Mr. Frear).[14] In a complete about-face, Congress enacted legislation to reverse the effects of 47 years of federal Indian policy. The Indian Reorganization Act [IRA], ch. 576, 48 Stat. 984 (1934) (codified as amended at 25 U.S.C. §§ 461–479 (1976)), prohibited further allotment of Indian land, sought to return to the Tribes some portion of the 90 million acres of Indian land that had passed into non-Indian ownership under the allotment program, and authorized tribes to establish tribal governments with authority over the development and exploitation of Indian land and resources. Tribes that elected to organize under the Act were entitled "to prevent the sale, disposition, lease or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe...." IRA § 16, 48 Stat. 984, 987 (codified at 25 U.S.C. § 476 (1976)). Among the purposes of the IRA were the promotion of a significant increase in tribal autonomy and authority and the extension to the tribes of "an opportunity to take over the control of their own resources." 78 Cong.Rec. 11123–25 (1934) (remarks of Mr. Wheeler). *See Morton v. Mancari,* 417 U.S. 535, 542, 94 S.Ct. 2474, 2478, 41 L.Ed.2d 290 (1974); F. Cohen, *supra,* at 147. The tax exempt and trust status of unalloted and restricted reservation lands was continued indefinitely, a provision that induced at least one state to insist that tribes within its borders be excluded from the Act. *See* 78 Cong.Rec.

---

**14.** Congressman Howard, a sponsor of the Indian Reorganization Act, described the allotment program as follows:

In the debates that accompanied the passing of the allotment act, it is clear that the proponents of this measure were convinced that the private ownership of land was the one great step that was needed to civilize the Indians. The mere issuance of a fee patent would give to the Indians pride of ownership, thrift, industry, and the means of self-support; it would break down the tribal status of the Indians and convert them into typical American citizens; it would, they said, solve the Indian problem, and in the course of a single generation relieve the Government of the immense and costly burden of caring for its Indian wards. There were, to be sure, a few farsighted men who predicted that the allotment law would lead to the economic ruin of the Indians, but their voices were lost in the chorus of optimism which accompanied the passage of the allotment act.

· · · · ·

The allotment act, so far from being a means of civilizing the Indians soon became a perfect tool for the capture of Indian lands....

· · · · ·

As a result of this system, the allotted Indian reservations are in general riddled by alienations, the extent of the alienation being almost exactly proportionate to the length of time since the original allotment was made. The Indians of many tribes have lost practically every square foot of land they owned.

Many reservations have in Indian ownership a mere fragment of the original land and all the remaining allotted reservations are badly checkerboarded....

· · · · ·

This poverty contributes largely to the excessive death rate among the Indians, which, in the case of tuberculosis, a disease closely associated with undernourishment, is more than seven times the death rate from tuberculosis among the whole population.

· · · · ·

Although many thousands of Indians are living in tribal status on the various reservations, their own native tribal institutions have very largely disintegrated or been openly suppressed, and the entire management of Indian affairs has been more and more concentrated in the hands of the Federal Indian Service. The powers of this Bureau over the property, the persons, the daily lives and affairs of the Indians have in the past been almost unlimited. It has been an extraordinary example of political absolutism in the midst of a free democracy—absolutism built up on the most rigid bureaucratic lines, irresponsible to the Indians and to the public, shackled by obsolete laws; resistant to change, reform, or progress; which, over a century, has handled the Indians without understanding or sympathy, which has used methods of repression and suppression unparallelled in the modern world outside of Czarist Russia and the Belgian Congo.

78 Cong.Rec. 11727–29 (1934).

11126 (1934) (remarks of Mr. Thomas); IRA § 13 (codified at 25 U.S.C. § 473 (1976)).[15]

Congress recognized that the various statutory provisions permitting leasing of tribal land were scattered, inconsistent, and in conflict with the provisions of the IRA giving the tribes authority to prevent leasing of tribal lands. In 1935 Congress considered, but did not enact, a bill intended to amend existing leasing statutes to permit tribal councils to grant leases for the mining of unallotted lands, subject to the approval and regulations of the Secretary of the Interior.[16] Ultimately, Congress decided to replace, rather than amend, existing leasing laws. In 1937, after extensive hearings on the conditions under which Indians were living,[17] the Senate and House Committees on Indian Affairs introduced bills to "bring all mineral-leasing matters in harmony with the Indian Reorganization Act." See S.Rep. No. 985, 75th Cong., 1st Sess. 3 (1937); H.R.Rep. No. 1872, 75th Cong., 3d Sess. (1938). The Senate Bill was enacted as the Act of May 11, 1938.[18] It

15. The district court noted that another purpose of the IRA was to enable Indians to enter the economic world on an equal footing. See, e.g., 78 Cong.Rec. 11730–31 (1934) (remarks of Mr. Howard). The IRA sought to accomplish this goal by authorizing tribes to form corporations, establishing a revolving credit fund for the benefit of these tribal corporations and their members, authorizing the purchase of additional land destined for tax-exempt Indian ownership, extending the tax-exempt and restricted status of existing unallotted Indian holdings, appropriating funds for college and technical education, and increasing Indian participation in and management of livestock and timber operations on tribal land. Id.; see also id. at 11123 (remarks of Mr. Wheeler).

Congress intended to effectuate increased tribal independence and economic power, but did not envision giving up federal responsibility for supervising these developments and providing necessary services for the Indians, and did not intend to turn its responsibility over to the states. Indeed, much of the opposition to the legislation was premised on its failure to reject protectionist policies. See, e.g., id. at 11126–27 (remarks of Mr. King); id. at 11733 (remarks of Mr. Kelley).

In the same legislative session, Congress enacted the Johnson-O'Malley Act, 48 Stat. 596 (codified as amended at 25 U.S.C. §§ 452–54 (1976)), authorizing the Secretary of the Interior to contract with state governments for the provision of education, health care, agricultural assistance and social services to Indians at federal expense. The legislative history of the Johnson-O'Malley Act indicates that Congress envisioned the federal government's paying states to provide these benefits to Indians living in widely scattered communities where maintenance of separate federal services and facilities would be impractical. See S.Rep. No. 511, 73d Cong.2d Sess. (1934). A letter from Bureau of Indian Affairs Commissioner Collier, incorporated in the Senate Report, discloses that the Bureau anticipated that it would continue to provide services directly to Indians living in large tribal communities, unless the Indians themselves sought to take advantage of the possibility of state contract services. See id. at 4. Indeed, the Appropriations Act of March 2, 1934, ch. 38, 48 Stat. 362, 366–79, had allocated several million dollars in federal and tribal funds for Indian education, and three million dollars for Indian health services, see 48 Stat. at 3771–76; see also 78 Cong.Rec. 821–22 (remarks of Mr. Howard).

The Appropriations Acts for the period following the enactment of the IRA demonstrate Congress's continuing commitment to the principle that education, health care, social services and tribal police, firefighters and courts should be provided through a combination of federal and tribal funds. See, e.g., Appropriations Act of August 9, 1937, ch. 570, 50 Stat. 564, 574–90; see also, e.g., 81 Cong.Rec. 4515–16 (1937) (remarks of Mr. Johnson); id. at 4589–90 (remarks of Mr. Burdick). We conclude, from our examination of the IRA and the statutes Congress enacted during the same period, that Congress did intend the IRA to assist Indians in achieving some measure of economic parity. It is manifest, however, that Congress did not intend for Indians to be dependent upon state governments for the benefits and services state governments traditionally provide.

16. S. 2638, 74th Cong., 1st Sess. (1935). See 79 Cong.Rec. 6102, 7350, 7815, 8307, 8308, 8481 (1935).

17. See, e.g., Survey of Conditions of the Indians in the United States: Hearings before a Subcomm. of the Senate Comm. on Indian Affairs, 75th Cong., 1st Sess. (1937); Survey of Conditions of the Indians in the United States: Hearings before a Subcomm. of the Senate Comm. on Indian Affairs, 74th Cong., 2d Sess. (1936); Conditions of Indians in the United States: Hearings before the House Comm. on Indian Affairs, 74th Cong., 2d Sess. (1936); Indian Conditions and Affairs: Hearings before the Subcomm. on General Bills of the House Comm. on Indian Affairs, 74th Cong., 1st Sess. (1935).

18. The 1938 Act provided:

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That hereafter unal-

replaced the prior mineral leasing statutes with a comprehensive and detailed procedure for mineral leasing of unallotted lands. *See* F. Cohen, *supra,* at 534. The Senate Report accompanying the bill noted that its purposes were to obtain uniformity with respect to the leasing of tribal lands, give Indians authority in granting or denying leases, and enable the Indians to gain the greatest return from their property. S.Rep. No. 985, 75th Cong., 1st Sess. 2 (1937). The Act made no mention of taxation, and the legislative history is silent on the issue.

lotted lands within any Indian reservation or lands owned by any tribe, group, or band of Indians, under Federal jurisdiction, except those hereinafter specifically excepted from the provisions of this Act, may, with the approval of the Secretary of the Interior, be leased for mining purposes, by authority of the tribal council or other authorized spokesmen for such Indians, for terms not to exceed ten years and as long thereafter as minerals are produced in paying quantities.

SEC. 2. That leases for oil- and/or gas-mining purposes covering such unallotted lands shall be offered for sale to the highest responsible qualified bidder, at public auction or on sealed bids, after notice and advertisement, upon such terms and subject to such conditions as the Secretary of Interior may prescribe. Such advertisement shall reserve to the Secretary of the Interior the right to reject all bids whenever in his judgment the interest of the Indians will be served by so doing, and if no satisfactory bid is received, or the accepted bidder fails to complete the lease, or the Secretary of the Interior shall determine that it is unwise in the interest of the Indians to accept the highest bid, said Secretary may readvertise such lease for sale, or with the consent of the tribal council or other governing tribal authorities, a lease may be made by private negotiations: *Provided,* That the foregoing provisions shall in no manner restrict the right of tribes organized and incorporated under sections 16 and 17 of the Act of June 18, 1934 (48 Stat. 984), to lease lands for mining purposes as therein provided and in accordance with the provisions of any constitution and charter adopted by any Indian tribe pursuant to the Act of June 18, 1934.

SEC. 3. That hereafter lessees of restricted Indian lands, tribal or allotted, for mining purposes, including oil and gas, shall furnish corporate surety bonds in amounts satisfactory to the Secretary of the Interior, guaranteeing compliance with the terms of their leases: *Provided,* That personal surety bonds may be accepted where the sureties deposit as collateral with the said Secretary of the Interior any public-debt obligations of the United States guaranteed as to principal and interest by the United States equal to the full amount of such bonds or other collateral satisfactory to the Secretary of the Interior, or show own-ership to unencumbered real estate of a value equal to twice the amount of the bonds.

SEC. 4. That all operations under any oil, gas, or other mineral lease issued pursuant to the terms of this or any other Act affecting restricted Indian lands shall be subject to the rules and regulations promulgated by the Secretary of the Interior. In the discretion of the said Secretary, any lease for oil or gas issued under the provisions of this Act shall be made subject to the terms of any reasonable cooperative unit or other plan approved or prescribed by said Secretary prior or subsequent to the issuance of any such lease which involves the development or production of oil or gas from land covered by such lease.

SEC. 5. That the Secretary of the Interior may, in his discretion, authorize superintendents or other officials in the Indian Service to approve leases for oil, gas, or other mining purposes covering any restricted Indian lands, tribal or allotted.

SEC. 6. Sections 1, 2, 3, and 4 of this Act shall not apply to the Papago Indian Reservation in Arizona, the Crow Reservation in Montana, the ceded lands of the Shoshone Reservation in Wyoming, the Osage Reservation in Oklahoma, nor to the coal and asphalt lands of the Choctaw and Chickasaw Tribes in Oklahoma.

SEC. 7. All Act or parts of Acts inconsistent herewith are hereby repealed.

Act of May 11, 1938, ch. 198, 52 Stat. 347 (codified at 25 U.S.C. §§ 396a–396g (1976)).

Six reservations were excluded from the operation of much of the Act. These included the Papago Reservation, subject to special mineral leasing provisions of section 3 of the IRA, and the Crow Reservation, which voted against organizing under the IRA, *see* G.D. Taylor, *supra* note 6, at 33, and which was subject to leasing under the provisions of the Act of May 26, 1926, ch. 403, § 6, 44 Stat. 658, 659. Also excluded were lands that the Shoshone Reservation had ceded to the United States, and three Oklahoma reservations that had been excluded from the IRA. The Crow and Papago reservations were ultimately made subject to the 1938 Act's provisions. *See* Act of May 27, 1955, ch. 106, § 1, 69 Stat. 67; Act of May 17, 1968, Pub.L. 90–308, 82 Stat. 123. *See generally* P. Maxfield, M. Dieterich & F. Trelease, *Natural Resources Law on American Indian Lands* 164 (1977).

## II

■ The Tribe argues that the 1938 Act's general repealer clause implicitly repealed the 1924 consent to taxation. We disagree. Many of the leases entered into under the authority of earlier statutes remained effective, indeed, remain effective today, because the prior statutory provisions authorized leases to continue for an indefinite term. *See* Appropriations Act of June 30, 1919, ch. 4, § 26, 41 Stat. 3, 32 ("irrevocable" with certain exceptions); Act of May 29, 1924, ch. 210, 43 Stat. 244 ("as long as oil or gas shall be found in paying quantities"). The 1938 Act expressly limits its application to leases entered into after the Act's effective date. In section one, the Act provides that "hereafter unallotted lands ... may ... be leased for mining purposes...." The "hereafter" language is echoed in section 3 of the Act. Finally, section 4 of the Act provides that "operations under any oil, gas, or other mineral lease issued pursuant to the terms of this *or any other Act* affecting restricted Indian lands shall be subject to the rules and regulations promulgated by the Secretary of the Interior." (Emphasis supplied). We infer from the statutory language that Congress envisioned that leases issued pursuant to prior acts would continue to be effective for their duration, subject to regulations promulgated by the Secretary and to the statutes under which they were executed. Leases made after the effective date of the Act, however, were to be governed by the new terms and procedures.[19] This interpretation, we believe, is both the most natural reading of the statutory language and the reading best adapted to the effectuation of the statute's purposes. To

infer repeal of the prior statutes on the basis of the general repealer in section 7 of the Act would introduce serious uncertainty as to the legal status of the indefinite-term leases executed under earlier acts and cast doubt on the Secretary's authority to continue to regulate them. Such a result would serve neither the interests of the Tribe nor the interests of the producer-lessees.

■ Having concluded that the 1938 Act superseded but did not repeal prior leasing statutes, we turn to the current effect of the consent to taxation contained in the 1924 amendment to the 1891 Act. We hold that leases executed pursuant to the 1891 and 1924 Acts remain subject to those Acts, and to the regulations promulgated by the Secretary under the authority of section 4 of the 1938 Act for regulation of leases issued "pursuant to the terms of this or any other Act." It follows that the 1924 Act's consent to state taxation remains effective with respect to leases executed under the 1924 and 1891 Acts.[20] We therefore affirm the district court's grant of summary judgment to the State of Montana insofar as it upholds the validity of taxing tribal proceeds from 1924 Act and 1891 Act leases.

## III

Montana argues that if the 1938 Act did not implicitly repeal the 1924 Act, it must be read implicitly to have incorporated the 1924 Act. Therefore, Montana contends, if it may tax oil and gas production under 1891 and 1924 Act leases, it may tax production under 1938 Act leases as well. The

---

**19.** We acknowledge that the statutory language is susceptible to more than one interpretation. The 1938 Act excludes six Indian tribes from its scope and, in addition, expressly preserves the authority of tribes organized under the IRA to lease lands for mining purposes according to the provisions of their tribal constitutions or charters. *See supra* note 18. The reference to leases issued pursuant to "any other statute" might thus be read to refer only to the IRA and statutes affecting the six excluded tribes. We feel constrained to reject this interpretation because it makes no provision for extant, indefi-

nite-term leases entered into under prior statutes.

**20.** Professor Cohen's treatise suggests a similar interpretation:

The [1938] Act omits any taxing authorization and includes a provision repealing "[a]ll Act [sic] or parts of Acts inconsistent herewith." The latter provision likely repealed the prior leasing Acts to which the tax consents had related (*as to new leases*).

F. Cohen, *supra* note 4, at 409 (emphasis supplied; footnotes omitted).

district court found this argument persuasive. We do not.

The 1924 Act in its entirety provides as follows:

Be *it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That unallotted land on Indian reservations other than lands of the Five Civilized Tribes and the Osage Reservation subject to lease for mining purposes for a period of ten years under the proviso to section 3 of the Act of February 28, 1891 (Twenty-sixth Statutes at Large, page 795), may be leased at public auction by the Secretary of the Interior, with the consent of the council speaking for such Indians, for oil and gas mining purposes for a period of not to exceed ten years, and as much longer thereafter as oil or gas shall be found in paying quantities, and the terms of any existing oil and gas mining lease may in like manner be amended by extending the term thereof for as long as oil or gas shall be found in paying quantities: *Provided,* That the production of oil and gas and other minerals on such lands may be taxed by the State in which said lands are located in all respects the same as production on unrestricted lands, and the Secretary of the Interior is hereby authorized and directed to cause to be paid the tax so assessed against the royalty interests on said lands: *Provided, however,* That such tax shall not become a lien or charge of any kind or character against the land or the property of the Indian owner.

Ch. 211, 43 Stat. 244 (codified at 25 U.S.C. § 398 (1976)). Montana concedes that the provisions of the Act concerned with the procedure for issuing leases and the duration of leases have been superseded by the 1938 Act. Moreover, the statutory method for collecting the tax—disbursement by the Secretary—seems equally inapplicable to the current leases. Montana argues, however, that the language *"Provided,* that the production of oil or gas and other minerals on such lands may be taxed by the State in which said lands are located in all respects

the same as production on unrestricted lands ..." is nowhere contradicted by the 1938 Act and is inconsistent with no provision of the later statute. Therefore, Montana insists, Congress's silence in 1938 on the subject of taxation must be interpreted as an implicit incorporation of the taxation portion of the 1924 Act into the 1938 statutory scheme.

Montana's argument is, in essence, an invocation of assorted maxims of statutory construction. Citing *United States v. Greathouse,* 166 U.S. 601, 605, 17 S.Ct. 701, 703, 41 L.Ed. 1130 (1897), Montana advises us of the rule that where two statutes on the same subject matter are not absolutely irreconcilable, both should be given effect. Montana also draws comfort from the canon that a long held agency interpretation of a statute in which Congress has silently acquiesced is entitled to great deference. *See United States v. Rutherford,* 442 U.S. 544, 554, 99 S.Ct. 2470, 2476, 61 L.Ed.2d 68 (1979). Montana points to informal decisions by the Solicitor of the Interior Department in 1956 and 1966 concluding that the 1924 Act's consent to state taxation applied to 1938 Act leases, and notes that the Department did not overrule these opinions until 1977. *See* 84 Interior Dec. 905, 911 (1977). In view of Congress's failure to alter the Department's 1956 interpretation, Montana suggests that the Department behaved improperly in repudiating its earlier view. Therefore, it concludes, this court must defer to the Department's 1956 position.

█ In invoking what it terms "the applicable rules of statutory construction," by which, it insists, we are bound, Montana fails to appreciate that such rules are merely guideposts in discerning Congressional intent. *See Busic v. United States,* 446 U.S. 398, 406–07, 100 S.Ct. 1747, 1752–53, 64 L.Ed.2d 381 (1980); *United States v. United Continental Tuna Corp.,* 425 U.S. 164, 168–69, 96 S.Ct. 1319, 1322–23, 47 L.Ed.2d 653 (1976); *Gooch v. United States,* 297 U.S. 124, 128, 56 S.Ct. 395, 397, 80 L.Ed. 522 (1936); *Shields v. United*

*States,* 698 F.2d 987, 990 (9th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 73, 78 L.Ed.2d 86 (1983).

■ Montana's argument that the 1924 consent must be construed as a blanket consent to taxation, effective with respect to all mineral leases on unallotted treaty reservation lands unless issued under a statute *prohibiting* taxation, stretches the canon of construction disfavoring repeals by implication beyond its intended scope. The cases Montana cites that invoke this canon are not apposite. In one case, the canon was invoked to dispose of arguments that a statute addressing one concern repealed an earlier statute addressing another, *see Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (Civil Rights Act did not repeal portion of IRA); in another, to dispose of arguments that an amendment to one part of a statute repealed another part, *see Posadas v. National City Bank,* 296 U.S. 497, 56 S.Ct. 349, 80 L.Ed. 351 (1936) (amendment to § 25 of Federal Reserve Act did not repeal unamended portion of section). We do not quarrel with the proposition that it is generally unwise to conclude, in the absence of any evidence, that Congress intended to cause a prior statute to have no future effect. Where Congress has enacted legislation without attention to the provisions of prior Acts, courts should not attribute to Congress the unexpressed purpose of nullifying earlier statutes. This general principle, however, is inapplicable where, as here, all parties concede that Congress intended the later statute to supersede the prior one. In enacting the 1938 Act, Congress manifested an unmistakable intention to subject subsequent leases to the terms of the new statute rather than to its predecessors. The crucial inquiry is whether Congress nonetheless intended that a portion of one of the predecessor statutes control a lease issued under the 1938 Act.

■ In ascertaining Congress's intent, we look to the language, legislative history and context of the 1938 Act, and find no manifestation of a purpose to subject leases under the new statutory scheme to the taxes authorized under several of the old statutory schemes. Montana asks that we infer such a purpose from Congress's silence. The Supreme Court has instructed us, however, that congressional consent to state taxation of tribal income from on-reservation activities must be express. *See Bryan v. Itasca County,* 426 U.S. 373, 393, 96 S.Ct. 2102, 2113, 48 L.Ed.2d 710 (1976). We decline to hold that a canon of construction will suffice to supply the deficient express manifestation of Congress's intent to permit the tax.[21]

■ Montana also insists that we must interpret the two statutes in accordance with the Interior Department's earlier position. The deference we should accord to administrative interpretations of statutes is not absolute. *See Cruz v. Zapata Ocean Resources, Inc.,* 695 F.2d 428 (9th Cir.1982). In this case, we note several factors that undermine the authority of the 1956 interpretation. The Interior Department adopted its 1956 position informally, and without any analysis of the question before us—whether Congress intended the 1924 consent to taxation to apply to leases issued under the 1938 Act. *See* United States Dept. of the Interior Solicitor's Opinion M–36345 (May 4, 1956) (unpublished). The Interior Department's first articulation of this interpretation was not contemporaneous with the enactment of the 1938 statute, but rather, occurred 12 years later. The Department expressed this interpretation only in unpublished memoranda. The inference of Congressional acquiescence Montana would have us draw is undermined where, as here, there is no evidence that the Department's interpretation was brought to Congress's attention. *See also Girouard v. United States,* 328 U.S. 61, 69, 66 S.Ct. 826, 829, 90 L.Ed. 1084 (1946) ("It is at best treacherous to find in Congressional silence alone the adoption of a con-

---

**21.** We note in addition that commentators have expressed their opinions that the 1924 Act's consent to taxation is inapplicable to 1938 Act leas-

es. *See, e.g.,* F. Cohen, *supra* note 4, at 409; *see also* M. Price and R. Clinton, *Law and the American Indian* 804 (1983).

trolling rule of law."). Finally, the Department repudiated its earlier interpretation in 1977, see 84 Interior Dec. 905 (1977), in a published and carefully reasoned opinion that analyzed both statutes and the Department's prior rulings. In 1979, the Department reexamined and adhered to its 1977 position. See 86 Interior Dec. 181 (1979). Under these circumstances, confronted with two non-contemporaneous interpretations of the 1938 Act, we do not believe that we should defer to the informal, unpublished one merely because it is of earlier vintage.

We conclude that Montana's collection of maxims is insufficient support for what we view to be an unlikely proposition: that Congress intended that part of one sentence in one of the statutes otherwise totally superseded by the 1938 Act be incorporated into the 1938 Act, and that Congress manifested its intention through silence. There is nothing in the legislative history or the language of the 1938 Act even hinting that Congress anticipated that the provisions of *any* of the prior leasing statutes would be applied to leases issued under the 1938 Act.

We note, in addition, that the 1924 Act was an integral part of Congress's allotment program, under which all Indian land was intended to become subject to state taxation after the expiration of a brief trust period. See United States Department of the Interior, *supra*, at 856–59; *supra* section I. Congress's consent to the exercise of state taxing authority over Indian Tribes was in harmony with the purposes of allotment. The 1938 Act, however, replaced prior mineral leasing statutes with a scheme calculated to advance the policies of tribal sovereignty and economic growth reflected in the IRA. We fail to see how interpreting the 1938 Act to incorporate implicitly the portion of the 1924 Act consenting to state taxation would advance purposes of the 1938 Act.[22]

 We hold that the 1924 Act's consent to taxation is inapplicable to the 1938 Act and to leases executed pursuant to its authority. Accordingly, we reverse so much of the district court's judgment as upheld the taxation of tribal royalties earned on 1938 Act leases.

## IV

Montana argued to the district court that even if Congress had not consented to taxation of tribal proceeds from 1938 Act leases, its taxes were nonetheless valid because the legal incidence of the taxes fell on the non-Indian producer-lessees and not on the tribe. Because the district court concluded that the taxes were valid, it did not reach the question of the taxes' legal incidence. We therefore remand the case to enable the district court to address this issue. Should the court determine that the legal incidence of the tax falls on the producer-lessees, it should then decide whether Montana's statutes are preempted under the standards articulated in *Crow Tribe of Indians v. State of Montana*, 650 F.2d 1104 (9th Cir.1981), *amended*, 665 F.2d 1390 (9th Cir.), *cert. denied*, 459 U.S. 916, 103 S.Ct. 230, 74 L.Ed.2d 182 (1982).

---

**22.** The district court found harmony between the purposes of the IRA and the 1924 consent to taxation on the theory that the IRA sought to enable Indians to enter the economic world on an equal footing and taxation statutes are economic facts of oil and gas production. In identifying this harmonious aspect, the district court disregarded the IRA's express extension of the tax-exempt status of Indian land, see IRA §§ 2, 5; 48 Stat. 984, 984, 985 (codified at 25 U.S.C. §§ 462, 465 (1976)). In 1936, Congress acted to extend the tax exemption to land purchased with Indian trust or restricted funds, and appropriated money to reimburse Indians whose land had been taxed and redeem any land that had been forfeited for failure to pay assessed taxes. Act of June 20, 1936, ch. 622, 49 Stat. 984 (codified as amended at 25 U.S.C. § 412a (1976)). See H.R.Rep. 2398, 74th Cong., 2d Sess. (1936). Congress's commitment to the tax exempt status of restricted land, and its continuing appropriations for Indian education, health care, tribal police and tribal courts, services traditionally provided to state citizens by state governments from state taxes, demonstrate to us that Congress did not intend for Indians to be treated equally for tax purposes. See, e.g., Appropriations Act of August 9, 1937, ch. 570, 50 Stat. 564, 574–90.

AFFIRMED in part, REVERSED in part and REMANDED.

J. BLAINE ANDERSON, Circuit Judge, with whom WALLACE and KENNEDY, Circuit Judges, join, concurring and dissenting:

I concur, but with additional reasons, in the majority's holding that the 1938 Act did not impliedly repeal the 1924 Act. I respectfully dissent, however, from the majority's view that the 1924 Act's taxing authorization is inapplicable to leases entered into after promulgation of the 1938 Act.

My disagreement has three bases. First, the majority misapplies well-established rules of statutory construction by stating that the issue is whether the 1938 Act "expressly incorporated" the 1924 Act's taxing authorization. Majority Opinion at 13. Once having concluded that the 1924 Act is still in effect, I fail to understand how it can be construed to have no force. Second, there has been a long-standing and consistent interpretation by the Department of Interior of the continued effectiveness of the 1924 Act's taxing authorization. I find this prior consistent interpretation much more indicative of the intended effect of the 1938 Act on the 1924 Act than the Department's reversal of its prior position in 1977. Third, if Congress meant to abrogate the authority of the states to tax the extraction of mineral resources on unallotted land as conferred by the 1924 Act, it surely would have made such an intent clear. It did not and it is not the province of this court to make that judgment for the legislative branch.

The majority opinion concludes that the 1924 Act was not impliedly repealed because the 1938 Act recognized the continued effectiveness of leases entered under the authority of prior acts. I agree with that observation, but I believe as well that other reasons compel such a conclusion.

Section 7 of the 1938 Act contains a "general repealing" clause. It is hornbook law that a general repealer is in "legal contemplation a nullity." 1A C. Sands, *Sutherland Statutory Construction,* § 23.08 at 221 (4th ed. 1972). In fact, a general repealer has been held to imply "very strongly that there may be acts on the same subject which are not thereby repealed." *Hess v. Reynolds,* 113 U.S. 73, 79, 5 S.Ct. 377, 379, 28 L.Ed.2d 927 (1885). One must turn therefore to other rules governing the determination whether the 1938 Act repealed the 1924 Act. *Sutherland, supra.* As Congress did not expressly repeal the 1924 Act, the question is whether it impliedly did so.

Repeals by implication are strongly disfavored. *Morton v. Mancari,* 417 U.S. 535, 549, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974); *Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936). As stated by the Supreme Court in *Posadas:*

> There are two well-settled categories of repeal by implication—(1) where provisions in the two acts are in irreconcilable conflict, the latter act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the latter act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act. But in either case, the intention of the legislature to repeal must be clear and manifest . . . .

296 U.S. at 503, 56 S.Ct. at 352.

Simply, there is no "irreconcilable conflict" between the provisions of the 1924 and 1938 Acts. There is no doubt the two statutes are capable of coexistence. The 1938 Act uses and expands the oil and gas leasing procedures outlined in the 1924 Act and applies them to all leases. Section 1 of the 1938 Act, 25 U.S.C. § 396a, reiterates much of the language of the 1924 Act regarding tribal council consent, BIA approval, and a general ten-year durational limit on the leases. Section 2 of the 1938 Act, 25 U.S.C. § 396b, expands the 1924's Act public auction requirements. The 1938 Act is silent regarding taxation. The language of the statute does not evince a clear indication that repeal of the taxing authorization was intended. On its face, taxation

of mineral production is quite compatible with the 1938 Act.

Nor does the 1938 Act "cover the whole subject" of the 1924 Act, for although the 1938 Act was an attempt to make uniform the "patch-work state" of the prior leasing laws, F. Cohen, *Handbook of Federal Indian Law,* 328 (1942 ed.), it is silent on the subject of taxation. It is true that the 1938 Act replaces the 1924 Act's leasing procedures. The taxing provision of the 1924 Act stands on its own, however. As stated in *Posadas,* an implied repeal will be found only to the extent of the conflict between the prior and latter statutes. 296 U.S. at 503, 56 S.Ct. at 352. The 1938 Act does not address taxation and nothing otherwise indicates that taxation conflicts with it.

Last, there has been a long-term interpretation by the Department of Interior that the 1938 Act did not impliedly repeal the 1924 Act, including its taxing authorization. See 84 Interior Dec. 905 (1977) and its references to the prior opinions. Generally, the construction of a statute by the agency charged with its administration is entitled to great weight, especially when, as here, Congress has refused to alter the administrative interpretation. *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969).

Once having concluded that no implied repeal occurred, the majority nonetheless states that the taxing consent does not apply to the 1938 Act because the 1938 Act did not "expressly incorporate" the 1924 Act's taxing authorization. See majority opinion at 13, 17. Such a result plainly contravenes the principle that once having found no implied repeal, it is the court's obligation to read the statutes together and give effect to both. *Morton v. Mancari,* 417 U.S. at 551, 94 S.Ct. at 2483; *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 133–134, 95 S.Ct. 335, 353–354, 42 L.Ed.2d 320 (1974); *see Nebraska Public Power District v. 100.95 Acres of Land,* 719 F.2d 956 (8th Cir.1983); *Yellowfish v. City of Stillwater,* 691 F.2d 926 (10th Cir. 1982), *cert. denied,* — U.S. —, 103 S.Ct.

2087, 77 L.Ed.2d 298 (1983). The majority's holding also neglects the related rule that "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one regardless of the priority of enactment." *Morton,* 417 U.S. at 550–551, 94 S.Ct. at 2483. The 1938 Act is a general leasing statute and the specific taxing provision of the 1924 Act should be read into it, rather than nullified. *See Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 153, 96 S.Ct. 1989, 1992, 48 L.Ed.2d 540 (1976).

By implication, the majority relies on the Tribe's argument that this court should follow the canon of construction which provides that ambiguities in statutes are to be resolved in favor of the Indian tribes. *See, e.g., Bryan v. Itasca County,* 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976). The taxing authorization in the 1924 Act is, however, unambiguous. This "canon of construction is not a license to disregard clear expressions of ... congressional intent." *DeCoteau v. District County Court,* 420 U.S. 425, 447, 95 S.Ct. 1082, 1094, 43 L.Ed.2d 300 (1975); *accord, Andrus v. Glover,* 446 U.S. 608, 619, 100 S.Ct. 1905, 1911, 64 L.Ed.2d 548 (1980). Nor does the 1938 Act create any ambiguity. It is silent on the repeal of the 1924 Act. Use of this canon of construction would require the court to amend the 1938 Act to expressly limit the 1924 Act. That, however, goes beyond a liberal interpretation of an ambiguous clause or phrase and entails legislating by the judicial branch. This we may not do. *Shields v. United States,* 698 F.2d 987, 990 (9th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 73, 78 L.Ed.2d 86 (1983); *see Fry v. United States,* 557 F.2d 646, 649 (9th Cir.1977), *cert. denied,* 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 754 (1978).

In *British-American Oil Producing Co. v. Board of Equalization,* 299 U.S. 159, 57 S.Ct. 132, 81 L.Ed. 95 (1936), the Supreme Court was faced with a similar situation. In that case the Court upheld Montana's right to tax oil and gas production on the Blackfeet Reservation pursuant to the 1924

Act. The non-Indian oil producer argued that two other statutes, the Act of June 30, 1919, 41 Stat. 3, 16, 17, and the Act of September 20, 1922, 42 Stat. 857, specifically governed the leasing of minerals on the Blackfeet Reservation. These provisions were silent on the subject of state taxation and, it was argued, the 1924 Act therefore did not apply. The Court, however, read all the acts together as one law and approved state taxation under the 1924 Act. 299 U.S. at 166. This court should do the same. While the 1938 Act replaced the 1924 Act's leasing provisions, the taxing authorization was left intact and must be read as effective along with the 1938 Act. *See Yellowfish*, 691 F.2d at 930.

The question is not whether the 1938 Act "expressly incorporated" the 1924 Act, but whether the 1924 Act's taxing authorization applies under its own terms to leases entered into under the 1938 Act. The language of the 1924 Act and the construction of it by the Supreme Court show that it is applicable. By its plain language, the 1924 Act applies to "unallotted land on Indian reservations other than the lands of the Five Civilized Tribes and the Osage Reservation subject to lease for mining purposes for a period of ten years under the proviso to Section 3 of the Act of February 28, 1891...." The Act then provides that "the production of oil and gas and other minerals *on such lands* may be taxed by the state...." (Emphasis added). "Such lands" clearly applies to unallotted lands subject to lease under the 1891 Act. Lands subject to lease under the 1891 Act are those "lands occupied ... by Indians who have bought and paid for the same, and which lands are not needed for farm or agricultural purposes...." In *British-American Oil*, the Supreme Court construed this language to include not only "lands acquired by Indians through the payment of a consideration in money, but

equally including lands reserved for Indians in return for cession or surrender by them of other lands, possessions or rights." 299 U.S. at 164, 57 S.Ct. at 134. The Court relied on *Strawberry Valley Cattle Co. v. Chipman*, 13 Utah 454, 45 P. 348 (1896), and uniform administrative practice to support its construction of "bought and paid for":

> It has been repeatedly ruled that Indians who are in possession of lands that have been given to them by the United States, for permanent occupancy, where Congress has recognized the right and title of the Indians to such lands, holds said lands as purchasers having paid for the same, in the sense in which the words "have paid for the same" are used in the Act of 1891.

Opinion of the Assistant Attorney General, cited in 25 Land Dec. 408, 412 (1897); *see Strawberry Cattle Co.*, 45 P. at 350–351.

The Tribe argued, and the majority impliedly accepts, that the use of the term "such lands" in the 1924 Act should limit the tax authorization to leases made pursuant to the 1891 or 1924 Acts. We think the plain meaning of the 1924 Act cannot be so narrowly constricted. The term "such lands" addresses generally the property which may be leased. It does not refer only to those leases in which the 1891 or 1924 Acts are cited as authority. In *British-American Oil*, the Supreme Court concluded that the 1924 Act authorized taxation of oil and gas leasing on the Blackfeet Reservation. In addition, Felix Cohen construed the 1924 Act as applying to unallotted reservation land. *Handbook of Federal Indian Law, supra*, at 257. The 1938 Act leases at issue here involve unallotted land. The language of the 1924 Act's taxing authorization is broad, and it plainly applies.[1]

---

**1.** Mr. Cohen also made no mention of any loss of effectiveness of the 1924 Act's authority for state taxation due to the 1938 Act. At the time of the 1942 publication of his *Handbook*, Mr. Cohen was an Assistant Solicitor in the Department of Interior. Mr. Cohen, who died in 1953, was also this country's preeminent authority on Indian law. Presumably, he was well aware of the intent underlying the 1938 Act and surely he would have been aware of any loss of effectiveness of the 1924 Act due to the operation of the 1938 Act. Perhaps that is why the Department of Interior consistently upheld state taxation of mineral resources until 1977.

I also disagree with the majority's rejection of the long and consistent Department of Interior interpretation that the 1938 Act did not affect the right of the states to tax. First, from 1938 to 1956 the Department of Interior acquiesced in state taxation of mineral production, notwithstanding the existence of the 1938 Act. Since Interior sponsored the 1938 Act, it certainly could have put an end to state taxation of mineral extraction if it intended the 1938 Act to have that effect. Then, in 1956, the Solicitor for the Department of Interior explicitly found that the 1938 Act did not affect the 1924 Act's taxing authorization. In 1966, the Solicitor affirmed this position. It was not until 1977 that the Department reversed its position. 84 Interior Dec. 905. The majority follows that later decision in holding that taxation is permitted only for leases entered under the authority of the 1924 and 1891 Acts. This later interpretation, however, overturned a long-standing and consistent administrative construction of the law, and is not entitled to any substantial deference. *Watt v. Alaska,* 451 U.S. 259, 272–273, 101 S.Ct. 1673, 1680–81, 68 L.Ed.2d 80 (1981); *Red Lion Broadcasting Co.,* 395 U.S. at 381, 89 S.Ct. at 1801.

Instead, this court should rely on the Department's prior consistent interpretation of the 1924 and 1938 Acts. It is true, as the majority states, that the prior announcements of the Department were not contemporaneous with the passage of the 1938 Act. Also, they were informal opinions. Nonetheless, they are still entitled to deference from the courts. *See Rice v. Rehner,* — U.S. —, — – — & n. 13, 103 S.Ct. 3291, 3300–3301 & n. 13, 77 L.Ed.2d 961, 976–977 & n. 13 (1983); *Assiniboine & Sioux Tribes v. Nordwick,* 378 F.2d 426, 432 (9th Cir.1967), *cert. denied,* 389 U.S. 1046, 88 S.Ct. 764, 19 L.Ed.2d 838 (1968). Moreover, they most likely were

the result of what the Department thought was plainly the law, i.e., the 1938 Act had no effect on the power of the states to tax mineral resource extraction on unallotted land because it did not expressly repeal the 1924 Act.

If Congress had intended to limit the taxing authorization of the 1924 Act, it would have done so expressly. Surely, there would have been at least some protest from the representatives of the western states, to which the taxation of mineral resources is so important, if the 1938 Act was intended to have such effect. No such protest can be found in the history of the passage of the 1938 Act.

For the preceding reasons, I would affirm the district court.[2]

---

**2.** The Act of March 3, 1927, 44 Stat. 1347, codified at 25 U.S.C. §§ 398a–e, permits the state taxation of mineral resource extraction on unallotted executive order reservation land. *See Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982). The majority fails to point out that its holding would have

a like effect on the continued effectiveness of the 1927 Act, which was modeled largely on the 1924 Act.